# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO: 8:20-cr-207-CEH-UAM

PHILLIP ROY WASSERMAN

_____

## **ORDER**

This matter comes before the Court upon Defendant Philip Roy Wasserman's Motion for Judgment of Acquittal and Motion for New Trial (Doc. 819), and the Government's response (Doc. 838). Defendant's renewed Motion for Judgment of Acquittal asks the Court to vacate his conviction on all counts based on insufficiency of the evidence. Doc. 819 at 1. In the alternative, he moves for a new trial on all counts under Federal Rule of Criminal Procedure 33. *Id.* After careful consideration and review of the record and submissions, the Court finds that the Government presented sufficient evidence such that a reasonable trier of fact could find Defendant guilty beyond a reasonable doubt on all counts, and that the interest of justice does not warrant a new trial.

## **BACKGROUND**[1]

On June 23, 2020, a federal grand jury in the Middle District of Florida returned an indictment that charged Defendant Phillip Roy Wasserman with

---

[1] Here and throughout this Order, the Court cites to the specific evidence in the record and transcripts of testimony where the Parties provided citations. Otherwise, where specific citations were not provided, the Court relies on its recollection of the trial and the briefing.

conspiracy to commit wire fraud and mail fraud (Count One); wire fraud (Counts Two through Four); and mail fraud (Counts Five through Seven). Doc. 1 at 1–16. Months after his arrest, a federal grand jury in the Middle District of Florida returned a superseding indictment charging Wasserman with conspiracy to commit wire fraud and mail fraud (Count One); wire fraud (Counts Two through Six); mail fraud (Counts Seven through Ten); evasion of payment of income taxes (Count Eleven); and fraud and false statements (Counts Twelve through Eighteen). Doc. 69 at 1–25. Counts Eleven through Eighteen were severed from the remainder of the Superseding Indictment. Doc. 376.

### A. Evidence and Testimony Presented by the Government

On April 3, 2023, trial began on the fraud counts. Doc. 724. The Government presented extensive testimony and introduced numerous evidentiary exhibits, including but not limited to the following.

In 2016, Wasserman created an Executive Summary and Business Plan for "FastLife," ostensibly a new life insurance venture. These documents were distributed to numerous victim-investors who testified at trial. *See* Docs. 809-86, 809-104, 809-89, 809-139. Co-Defendant Kenneth Rossman was identified in those documents as Interim CFO of FastLife, although he later wrote in a September 2018 email to Wasserman and testified that he was "CFO only in name." Doc. 809-525.

Numerous investors (and Rossman himself) testified that Wasserman and/or Rossman represented to potential investors that: (1) annual returns of 10 or 12 percent a year were guaranteed; (2) investors would receive monthly interest

payments or, if they reinvested earned interest into their investments, full payment of principal and interest at maturity; (3) Rossman had invested his own money in the venture; and (4) investment funds would be used to pay for FastLife start-up expenses.

Testimony and evidence showed that potential investors were not informed that: (1) funds were deposited and commingled in a bank account used by Wasserman to pay for both venture expenses and personal expenses; (2) there was no contemporaneous bookkeeping or accounting of the commingled funds; (3) there were surrender fees and other costs, as well as negative tax consequences, associated with some of the investors' liquidation of traditional investments and life insurance policies; (4) Wasserman and Rossman each had federal tax liens in substantial amounts pending against them; (5) Wasserman had numerous outstanding civil judgments filed against him related to earlier investment programs he operated, unpaid private loans, unpaid advertising expenses, foreclosures, evictions, and other civil actions; (6) FastLife had accumulated large, unpaid business debts; (7) Wasserman used investor funds to make payments to other investors in FastLife as well as to investors from earlier investment schemes; and (8) Wasserman paid Rossman a percentage of solicited investments and paid himself a sizable amount of compensation.

The evidence showed that Wasserman and Rossman caused victim-investors to transmit FastLife investment funds via interstate wire transmissions, mailings, and FedEx, as well as hand-delivery during in-person meetings.[2]

After the Government rested its case on May 3, 2023, Defendant made an oral motion for judgment of acquittal on Count One and an oral motion for judgment of acquittal as to the remaining Counts against him pursuant to Federal Rule of Criminal Procedure 29. Docs. 767–769. The Court denied both motions the following day. Doc. 773. Specifically, the Court found that the Government had presented adequate or sufficient evidence to the jury, from which they could find Wasserman guilty beyond a reasonable doubt. The Court noted that this evidence included circumstantial evidence.

As to Count One, the Court noted that although Wasserman argued there was no direct evidence of a partnership or agreement between him and Rossman to accomplish an unlawful purpose, there was circumstantial evidence from which the jury could conclude that the two conspired to commit wire fraud and/or mail fraud. Additionally, the Court referenced the Eleventh Circuit Pattern Jury instructions and noted that the Government had provided sufficient evidence of an agreement between Wasserman and Rossman to accomplish a common and unlawful plan to commit wire fraud or mail fraud, as charged in the Superseding Indictment.

Finally, with regard to the substantive counts of wire fraud and mail fraud, the Court found that, viewing the evidence in the light most favorable to the

---

[2] Docs. 809-645; 809-84;  809-651; 809-663; 809-670.

Government, the jury could find that Wasserman acted with the intent to defraud the investors, and that sufficient evidence had been presented in support of the substantive offenses as well. As to Count Ten, which was based on an interest payment to an investor made after Wasserman was indicted, the Court noted that the Government contended this payment was made to lull an investor into a false sense of security with regards to the money she was owed. And again, viewing the evidence in the light most favorable to the Government, the Court found that there was sufficient evidence upon which a jury could find Wasserman guilty of mail fraud as to Count Ten. Therefore, the Court denied the motion for judgment of acquittal as to all counts, as well as the motions requesting a judgment of acquittal on Counts One and Ten specifically.

After the conclusion of evidence at trial, Defendant made a renewed oral motion for Judgment of Acquittal pursuant to Rule 29, which the Court again denied for the reasons stated on the record, including that the evidence presented was such that a jury could find for either party. As to Count One, the Court again found that there was sufficient circumstantial evidence presented such that a jury could find that Wasserman and Rossman agreed to enter into a conspiracy. With regards to the remaining counts, the Court found that there was sufficient evidence from which a jury could find Defendant guilty, and that it would thus be inappropriate to direct a verdict in favor of Defendant on any Count.

Closing arguments were held on May 11, 2023. Doc. 790. The jurors began to deliberate on May 12. Doc. 798. On May 15, the jury found Wasserman guilty on all

counts. Doc. 806. Defendant filed the instant motion on May 26 and the Government responded in opposition. Docs. 819, 838.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides the framework for judgment of acquittal based on a lack of sufficient evidence. Under Rule 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." After a jury verdict, under Rule 29(c), a defendant "may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."

In deciding a Rule 29 motion, a district court must "determine whether, viewing all evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Grigsby*, 111 F.3d 806, 833 (11th Cir. 1997) (quoting *United States v. O'Keefe*, 825 F.2d 314, 319 (11th Cir. 1987)). To challenge a jury's guilty verdict based on insufficiency of the evidence, it must be established that "no reasonable jury could have found Defendant guilty beyond a reasonable doubt on the evidence presented." *United States v. Ruiz*, 253 F.3d 634, 639 (11th Cir. 2001). Federal Rule of Criminal Procedure Rule 29(d) states that: "[i]f the court enters a judgment of acquittal after a guilty verdict, the Court must also conditionally

determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The Court must specify the reasons for that determination."

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The Eleventh Circuit has described this as a "broad standard." *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994).  Additionally, "[t]he decision to grant or deny the new trial motion is within [the] sound discretion of the trial court and will not be overturned on appeal unless the ruling is so clearly erroneous as to constitute an abuse of discretion."  *Id.* (quoting *United States v. Wilson*, 894 F.2d 1245, 1252 (11th Cir. 1990)).

In ruling on the merits of a Rule 33 challenge, the Court "may weigh the evidence and consider the credibility of the witnesses." *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). However, it is not appropriate for the Court to "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.* at 1312–13. Instead, to warrant a new trial, the "evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* at 1313.

## A. Relevant Offenses and Elements

To prove a defendant guilty of conspiracy to commit wire fraud or mail fraud, the Government must establish beyond a reasonable doubt that: (1) two or more persons, in some way or manner, agreed to try to accomplish a common and

unlawful plan to commit wire fraud or mail fraud, as charged in the superseding indictment; and (2) the defendant knew the unlawful purpose of the plan and willfully joined in it. Doc. 803 at 18–19; Pattern Crim. Jury Instr. 11th Cir. O54.

To prove a defendant guilty of wire fraud, the Government must establish beyond a reasonable doubt that: (1) the defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises; (2) the false pretenses, representations, or promises were about a material fact; (3) the defendant acted with the intent to defraud; and (4) the defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud. Doc. 803 at 21–22; Pattern Crim. Jury Instr. 11th Cir. O51.

To prove the defendant guilty of mail fraud, it was necessary for the government to establish beyond a reasonable doubt: (1) the defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises; (2) the false or fraudulent pretenses, representations, or promises were about a material fact; (3) the defendant intended to defraud someone; and (4) the defendant used the United States Postal Service by mailing or causing to be mailed, or a private or commercial interstate carrier by depositing or causing to be deposited with the carrier, something meant to help carry out the scheme to defraud. Doc. 803 at 23–25; Pattern Crim. Jury Instr. 11th Cir. O50.1.

## DISCUSSION

Wasserman argues that there was insufficient evidence to sustain a jury verdict on any of the counts against him. Doc. 819 at 7. The Government responds that the trial evidence overwhelmingly proved that he participated knowingly, willfully, and with the intent to defraud in the scheme to defraud and the conspiracy charged and that he used, and caused to be used, wire transmissions, mailings, and FedEx shipments to help carry out the scheme. Doc. 838 at 4–5.

### A. Renewed Motion for Judgment of Acquittal

Defendant's oral motions for judgment of acquittal, made at two points during the course of trial, were denied by the Court. Both motions contended that the Government produced insufficient evidence for a reasonable jury to find him guilty on any count. As described above, the Court disagreed.

Now, with the benefit of additional review of the evidence presented at trial and the briefing of Defendant and the Government, the Court concludes, again, that the evidence at trial was sufficient for a reasonable jury to conclude that Defendant was guilty of conspiracy (Count One) as well as the substantive wire fraud counts (Counts Two Through Six) and mail fraud counts (Counts Seven, Eight, and Ten).

Defendant's renewed motion offers no new arguments. Instead, Defendant simply rehashes his previous arguments, this time referencing certain exhibits. However, review of the transcripts and exhibits indicates that the Court's previous understanding of the evidence was correct. Because Defendant offers no basis for the Court to reconsider its previous ruling, and for the reasons detailed below, the Court

will deny the Renewed Motion for Judgment of Acquittal. *See United States v. Atkins*, No. 8:18-CR-483-CEH-JSS, 2019 WL 6728263, at *6 (M.D. Fla. Dec. 11, 2019) (citing *United States v. Mulherin*, 529 F. Supp. 916, 923 (S.D. Ga. 1981), *aff'd*, 710 F.2d 731 (11th Cir. 1983)).

*Count One – Conspiracy*

Wasserman argues that the Government failed to present any evidence that he and Rossman agreed to accomplish an unlawful plan—an element of conspiracy to commit wire and mail fraud. Doc. 819 at 9. He asserts that Rossman testified he would not have solicited investor money if he thought he was causing them harm, that there was no direct evidence indicating he and Rossman "agreed to enter into a plan to commit mail and wire fraud," and that no reasonable juror could find that they conspired to commit a crime beyond a reasonable doubt. *Id.* at 9–10. Wasserman claims that because Rossman had no knowledge of how or where investor money was spent, it "makes no sense that he had agreed with Mr. Wasserman to cause these same investors a loss." *Id.* at 10.

The Government responds that its evidence established that Wasserman was the architect, organizer, and leader of the plan to commit wire fraud and mail fraud, and that Rossman joined in the plan and worked to execute it, largely at Wasserman's direction. Doc. 838 at 5. Although Rossman did not have a full picture of the scheme at the outset, the Government argues that his knowledge grew over the course of the conspiracy, and details regarding the unlawful purpose of the plan became clear to him. *Id.* Further, the Government argues that the evidence

established that Wasserman and Rossman agreed to accomplish what they knew was an unlawful plan to use false and fraudulent pretenses, misrepresentations, or promises and omissions about material facts to defraud the investors, and that they used wire transmissions, mailings, and shipments to carry out the scheme. *Id.* at 5–17. It concludes that this evidence was more than sufficient to enable the jury to find that the elements of the conspiracy in Count One were proven beyond a reasonable doubt. *Id.* at 17.

Viewing all the evidence in the light most favorable to the Government on Count One, a reasonable trier of fact could find Wasserman guilty beyond a reasonable doubt. Therefore, the Court will deny the motion as to Count One.

First, a person may be a conspirator even without knowing all the details of the unlawful plan. Doc. 803 at 18; Pattern Crim. Jury Instr. 11th Cir. O54. Therefore, even "[i]f [Wasserman] played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan—and willfully joined in the plan on at least one occasion—that's sufficient for [the jury] to find the defendant guilty." *Id.*

The Government cites a plethora of evidence and testimony upon which the jury could found Wasserman guilty on this count. For example, the evidence established that Wasserman crafted a FastLife Executive Summary and Business Plan in 2016, and several existing insurance clients received one or both promotional documents from Wasserman, through Rossman. Docs. 809-86, 809-104, 809-111, 809-139. Rossman, who referred to himself in correspondence with Wasserman as

FastLife "CFO only in name," had no access to FastLife's bank account, but was nevertheless held out as "Interim CFO" and contributed financial data to company documents based upon figures and formulas provided by Wasserman. Doc. 838 at 7; Doc. 809-525; Doc. 809-111 at 18.

Consistent with Wasserman's pitch, and at his direction, Rossman solicited investments in FastLife. Rossman and numerous victim-investors testified that the pitches included both material misrepresentations about the business and its founders and omitted or concealed a number of material facts about how FastLife was run, and about Wasserman and Rossman themselves. As testified to at trial by Rossman and numerous investors, investors were told that: (1) an annual return of 10 or 12 percent per year was guaranteed, substantially greater than they were receiving on their existing investments; (2) they would receive monthly interest payments, or, if they reinvested earned interest into FastLife, full payment of principal and interest at maturity; (3) Rossman had invested his own money in the venture; and (4) investment funds would be used to cover FastLife's start-up and growth costs. Testimony also showed that the pitches omitted that: (1) investors' funds were deposited and commingled in an account used by Wasserman to pay for personal and other expenses; (2) there was no contemporaneous bookkeeping or accounting of the funds; (3) surrender fees, costs, and other negative tax consequences would occur based on some investors' liquidation of traditional investments and loans taken out

against life insurance policies[3]; (4) Wasserman and Rossman each had significant federal tax liens filed against them[4]; (5) Wasserman had numerous outstanding civil judgments filed against him related to earlier investment schemes of his, as well as a number of other unpaid expenses and other civil actions [5]; (6) FastLife had accumulated significant unpaid business debts[6]; (7) Wasserman used investor funds to make Ponzi-style payments to certain other investors as well as payments to investors in an earlier investment scheme[7]; and (8) Wasserman paid Rossman a percentage of investor funds he solicited and also paid himself excessive compensation.[8]

### Evidence of Wasserman and Rossman's Agreement

Furthermore, the evidence showed that Wasserman and Rossman caused the investors to transmit FastLife investment funds via interstate wire transmissions, mailings, FedEx, and hand-delivery during in-person meetings (*See e.g.,* Doc. 809-645). Wasserman communicated with investors via email and text messaging and caused Ponzi-style payments to be transmitted as well. *See*, *e.g.*, Docs. 809-80, 809-92.

The Government also called as a witness D.B., an employee of M&A Service/Capital, a firm that helps insurance businesses raise capital. *See* Doc. 809-

---

[3] Doc. 809-589; *See* Doc. 809-674.
[4] Docs. 809-31, 809-45, 809-46, 809-47.
[5] *E.g.*, Docs. 809-24, 809-25, 809-26.
[6] *See*, *e.g.*, Docs. 809-49, 809-50.
[7] *See* Docs. 809-694, 809-696.
[8] *See* Docs. 809-55; 809-58 at 21; 425.

342. D.B. testified that he was engaged to evaluate FastLife's financials and prepare a presentation for sophisticated investors. He thus requested information about the company's operations, funding, expenses, and extensive financial documentation. Rossman prepared a written response in May 2016, at Wasserman's direction, using the information available to him. Doc. 809-344. The memo did not mention Wasserman's compensation, and Rossman testified that Wasserman told him he was not taking any compensation. Rossman provided the June 2016 FastLife Business Plan to D.B. He described the figures therein as actual revenues, which turned out to be untrue. D.B. ultimately never received sufficient information to feel comfortable that FastLife's income statement was credible. He told the defendants that if there was a compensation agreement, tax liens, judgments, or business debts, these should be disclosed to potential investors. An in-person meeting with Wasserman and Rossman did not lead to sufficient clarity on these issues, and Wasserman ultimately terminated the engagement with M&A.

In 2018, Wasserman told Rossman that thousands of applications taken by FastLife agents and counted as 2017 revenue had not been placed with insurance companies, necessitating a negative adjustment of about $3.8 million to FastLife's financials. Rossman testified that this revelation was incredibly concerning. This adjustment turned the business's financials from showing a significant profit to a loss. Rossman made this adjustment in the version of FastLife's February 2018 business plan that was produced to Florida's Office of Financial Regulation ("OFR")

in response to a subpoena. Doc. 809-54. However, this was not reflected in the February 2018 Business Plans provided to several investors. Docs. 809-111, 809-139.

Separately, Wasserman asked Rossman to make calls to vendors working with FastLife and field calls from aggrieved investors. He made these calls to vendors despite the fact he did not know the true financial state of FastLife. Docs. 809-316, 809-368. At Wasserman's direction, Rossman also took calls from investors complaining about late payments of interest and non-payments. He also received a letter from an investor expressing need for the return of his principal investment. Rossman showed the letter to Wasserman, who ultimately directed Rossman to drive to see the investor and assuage his concerns about an investigation into FastLife. Doc. 809-517. In connection with the visit, Wasserman caused an interest payment to be wired to that investor, according to OFR investigator Stephen Howland's testimony and as reflected in bank records. Doc. 809-618.

In April 2018, OFR served Wasserman a subpoena. Wasserman directed Rossman to help respond by pulling and making copies of the various FastLife Business Plan iterations. Rossman testified that, around this time, Wasserman presented a Compensation Agreement to him and directed him to sign it and backdate it as of 8/16/16. *See* Doc. 809-55. Howland testified that the Compensation Agreement was also produced to OFR in response to the subpoena, in an apparent effort to persuade OFR that Wasserman had not improperly spent investor money on personal expenses. The Government also points out that the Compensation Agreement's terms were significantly different from Wasserman's representations to

the IRS Revenue Officer charged with collecting on Wasserman's pending federal tax liens. *See* Docs. 809-508, 809-692.

Rossman also testified that FastLife's financial situation grew dire in 2018, as supported by emails between Wasserman and Rossman. Docs. 809-522, 809-523 ("This doesn't look very good are there any of the investors you could go back to and get a quick $50,000 for 30 days"), 809-524, 809-525 ("I can't buy any advertising because we owe everybody and I can't make any back payments"). Despite their knowledge of FastLife's precarious financial footing, neither Wasserman nor Rossman disclosed the truth about FastLife to investors, and Rossman continued to solicit investments, even securing additional funds from two investors in September and November 2018. Doc. 809-503.

The Government argues that throughout the period relevant to the Superseding Indictment, Wasserman's actions show that he had an intent to defraud the FastLife victim-investors, and specifically that he "act[ed] knowingly and with the specific intent to use false or fraudulent pretenses, representations, or promises to cause loss or injury." Doc. 803 at 22; Pattern Crim. Jury Instr. 11th Cir. O51. The Government cites several Eleventh Circuit cases for the proposition that harm does not necessarily mean long-term financial loss on the part of the victim, and that a harm occurs when a misrepresentation affects the victim's understanding of the nature or value of the bargain. Doc. 838 at 14. In this case, the Government argues the investors suffered both real economic injury, as well as harm based on their lack of knowledge regarding the true nature or value of the bargain. *Id.*

The Court agrees with the Government that in this Circuit, harm suffered by investors who were stripped of an understanding of the nature or value of investing in FastLife is sufficient to show that Wasserman had a specific intent to defraud the investors. Specifically,

> Under *Takhalov*, the term "harm" does not necessarily refer to long-term financial loss on the part of the victim. *See* 827 F.3d at 1313–14. Instead, a "harm" occurs when the misrepresentation affects the victim's understanding of the nature or value of the bargain. *Id*.; *Waters*, 937 F.3d at 1353–54.

*United States v. Kachkar,* 2022 WL 2704358 at *5 (11th Cir. 2022) (discussing *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) and citing *United States v. Waters,* 937 F.3d 1344 (11th Cir. 2019)).

Moreover, sufficient evidence was presented to satisfy the specific intent requirement in terms of actual economic injury suffered by the investors, as summarized by the Government in a number of debt accumulation charts that tracked debts owed to the individual investors. *See* Doc. 809-537.

At the same time the business and investors were suffering, the record shows that Wasserman spent large sums of investor funds on himself and his family, including on a personal residence[9], a beach house[10], vehicles[11], jet skis, a diamond ring[12], celebrity entertainment for his wife's birthday party[13], gambling[14], retail

---

[9] *See e.g.*, Doc. 809-422.
[10] *See* Docs. 809-404, 809-406,
[11] *See e.g.*, Doc. 809-717.
[12] *See* Docs. 809-497, 809-498.
[13] *See* Docs. 809-428, 809-714, 809-715
[14] *See* Docs. 809-441, 809-457, 809-469.

shopping, home improvements[15], personal insurance, and various other expenses. *See* Doc. 838 at 15–16.

At least in part due to these expenses, FastLife could not satisfy its obligations, and testimony and evidence at trial showed that contracts made with advertisers, a sports franchise, entertainers and celebrities, vendors, landlords, insurance agents, employees and independent contractors were not fulfilled.

The Government argues that Wasserman "spent just enough of the victim-investors' money to create the illusion that FastLife was established, growing, and profitable." *Id.* at 16. It also argues that Wasserman crafted false and fraudulent explanations in response to pressure from increasingly frustrated investors, and later falsely represented that he had engaged Baker Tilly to perform an audit showing that neither he nor FastLife had committed any wrongdoing. *See* Doc. 809-110. However, as a Baker Tilly employee testified at trial, the firm was not provided the information or documents it needed to perform an audit, nor was it paid in full. The firm began financial services for Wasserman but did not complete it.  As a result, Baker Tilly did not produce any final work product to Wasserman. Ultimately, the Government argues that the evidence was more than sufficient to enable the jury to find the essential elements of the conspiracy charged in Count One. Doc. 838 at 17.

The Court agrees. Wasserman's arguments for a judgment of acquittal (or a new trial) are neither supported by the record or the law. His argument that no evidence was presented by the Government showing that he and Rossman agreed to

---

[15] *See, e.g.*, Docs. 809-449, 809-450.

accomplish an unlawful plan is unpersuasive. In fact, as detailed in the Government's response and supported by both evidence and testimony, Wasserman and Rossman worked hand-in-hand to solicit investment funds from investors, often encouraging them to liquidate traditional investment vehicles along the way. The two made a number of material misrepresentations to those investors, while also omitting numerous material facts from them. In this way, the investors were harmed as described by the Eleventh Circuit in *Kachkar*, 2022 WL 2704358 at *5.

Wasserman also contends that the only plan Rossman testified to was that he and Wasserman agreed to grow FastLife and sell the company at a profit in order to make the investors and themselves money. However, this argument does not explain away the testimony of Rossman, who said that FastLife largely operated by luring investors through an array of material misrepresentations and omissions as described above. Furthermore, the materiality of the misrepresentations and omissions was illustrated by the fact that all victim-investors testified that had they known more about the FastLife operation, or Rossman and Wasserman individually, they would not have made an investment.

Wasserman puts forward an argument that "not one single email, not one single text message" showed that Rossman and Wasserman agreed to enter into a plan to commit mail and wire fraud. To the contrary, the Government introduced emails and text messages that showed Rossman and Wasserman discussing FastLife, its precarious financial state, and specific investors. Additionally, evidence and

testimony showed that Rossman and Wasserman arranged investor payments via wire transmissions, mailings, and FedEx shipments.

Wasserman also argues the intent requirement of a conspiracy was not established by the evidence because Rossman testified he would not have solicited money from investors if he believed it would harm them. Doc. 819 at 9–10. However, this argument ignores the fact that informational harm is enough to establish intent to defraud, and there was more than sufficient evidence for a jury to find that misrepresentations were made to the investors and that material facts were concealed from them. Therefore, because the Government's evidence was sufficient to show that Defendant's misrepresentations and omissions affected the victim-investors' understanding of the nature or value of their investments in FastLife, this argument fails. *Takhalov*, 827 F.3d at 1313–1314. Wasserman's argument that Rossman's lack of knowledge of FastLife's finances defeats intent similarly fails. In fact, Rossman's lack of knowledge about the true state of FastLife illustrates that the duo's pitches and other communications were built on misrepresentations and omissions.

Thus, after reviewing the pleadings, evidence, and testimony cited by both sides, the Court finds that "a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alaboud,* 347 F.3d 1293, 1296 (11th Cir. 2003) (internal quotation marks omitted). The testimony and evidence described above was sufficient to enable a rational jury to find, beyond a reasonable doubt, that Wasserman and Rossman agreed to accomplish what they

knew was an unlawful plan to use false and fraudulent pretenses, misrepresentations, or promises and omissions about material facts to defraud the investors, and that they used wire transmissions, mailings, and FedEx shipments to help carry out the scheme.

*Remaining Counts*

As to the remaining Counts, Defendant leans on the same arguments he made at trial—that he "spent a great deal of investor money on advertising to grow the company." Doc. 819 at 11. With regard to Counts Two, Three, Four, Seven and Eight, he argues that testimony from a number of victim-investors and others, together with the amount of money spent "on the company," means that no reasonable jury could find that he intended to cause investors a loss. *Id.* at 11–14. Wasserman also argues that based on "simple math," there is insufficient evidence to support a finding that he intended to cause loss to investors in Counts Five and Six, and that there was no evidence of him "lulling" S.C. with an interest payment in Count Ten, based on which the Court should grant a judgment of acquittal on that Count. *Id.* at 15–19.

The Government argues that the evidence and testimony it presented in favor of Count One proved that Wasserman was guilty of the substantive wire fraud and mail fraud charges, in that he "devised and participated in a scheme to defraud by using false pretenses, representations, and promises and omissions about material facts." Doc. 838 at 17. The Government notes that Wasserman stipulated that each of the wires that formed the basis for Counts Two through Six traveled in interstate

commerce. Doc. 809-610. Furthermore, the Government presented exhibits to the jury supporting the wires detailed in Counts Two (Doc. 809-703), Three (Doc. 809-715), Four (Doc. 809-702), Five (Doc. 809-623), and Six (Doc. 809-670)—and the mailings described in Counts Seven (Docs. 809-141, 809-142, 809-687), Eight (Docs. 809-66, 809-67, 809-625) and Ten (Docs. 809-84, 809-634). The investor(s) who made or received the payments related to each count testified regarding their investments, what they were told, not told, and how those disclosures would have affected their investment decisions. To a person, they all stated that the misrepresentations and omissions detailed by the Government would have influenced their decisions to invest in, or maintain their investments in FastLife.

Based on the evidence and testimony, the Government argues that Wasserman has not shown that no trier of fact could have found him guilty beyond a reasonable doubt, and that the verdict must be upheld. *Ruiz*, 253 F.3d at 634. The Court agrees and will deny the motion for a judgment of acquittal. Based on the testimony and evidence regarding the misrepresentations to and omissions from the investors, paired with the stipulations mentioned above and the Government's evidence regarding each wire or mailing described in Counts Two through Eight and Count Ten, there is more than sufficient evidence for a jury to find guilt beyond a

reasonable doubt on each count, and Wasserman's motion for judgment of acquittal is due to be denied.[16]

**B. Motion for New Trial**

In the alternative, Defendant seeks a new trial on each Count "in the interest of justice." Doc. 819 at 1, 9, 14, 16, 19. The Government responds that the interest of justice does not require a new trial, because this is not an exceptional case in which the evidence preponderates heavily against the verdict, such that a miscarriage of justice may have occurred and/or some substantial rights of a defendant may have been jeopardized at trial. Doc. 838 at 19–20.

Wasserman provides virtually no additional argument in support of a new trial. The Court finds that the interest of justice does not require a new trial in this case. For the same reasons that the motion for a judgment of acquittal was denied, the record does not show that the evidence preponderates heavily against the verdict, "such that it would be a miscarriage of justice to let the verdict stand." *Martinez*, 763 F.2d at 1313. Therefore, the motion will be denied.

Accordingly, it is hereby **ORDERED:**

1.     Defendant's Motion for Judgment of Acquittal and New Trial (Doc. 819) is **DENIED.**

**DONE** and **ORDERED** in Tampa, Florida on January 10, 2023.

---

[16] As for Wasserman's request for a new trial pursuant to Fed. R. Crim. P. 29(d) (Doc. 819 at 1), the Court is denying the motion for judgment of acquittal after a guilty verdict, so it need not enter a conditional ruling on a motion for new trial, as per Rule 29(d).

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties