## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                          CASE NO: 8:20-cr-207-CEH-UAM

PHILLIP ROY WASSERMAN

_____

### **ORDER**

This matter comes before the Court upon Defendant Philip Roy Wasserman's Motion for a Dismissal of the Conspiracy and Fraud Charges or a New Trial Based on Newly Discovered Evidence and Request for Evidentiary Hearing (Doc. 892).[1]

After a six-week trial, a jury found Wasserman guilty as to Count One (Conspiracy to Commit Wire and Mail Fraud), Counts Two through Six (Wire Fraud), and Counts Seven, Eight, and Ten (Mail Fraud) of the Superseding Indictment. Doc. 806.

Defendant moves for dismissal of the charges against him or a new trial on several grounds. *See* Docs. 892, 967, 1015. First, he argues that the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose information about the mental health of his co-defendant Kenneth Rossman, who pleaded guilty and appeared at trial as a government witness. Next, he argues that the Government violated *United States v. Giglio*, 405 U.S. 150 (1972), by not correcting Rossman's false

---

[1] Wasserman filed an amendment to the motion (Doc. 967) that expanded upon his request for a new trial based on alleged Fifth and Sixth Amendment violations. *Id.* at 3-6.

testimony. Separately, he moves for a new trial pursuant to Federal Rule of Criminal Procedure 33 based on (the same) newly discovered evidence about Rossman's health and because the Government allegedly violated his Fifth and Sixth Amendment rights by failing to disclose Rossman's records. The Government responds (Docs. 910, 1017) and Wasserman replies (Docs. 929, 1018). The Court heard argument on this motion on October 2, 2023, (Doc. 954) and held an evidentiary hearing on October 23. Doc. 1010. The Court now issues its written order denying Plaintiff's Motion in its entirety.

## BACKGROUND

On June 23, 2020, a federal grand jury in the Middle District of Florida returned an indictment charging Phillip Roy Wasserman and Co-Defendant Kenneth Rossman with conspiracy to commit wire fraud and mail fraud, wire fraud, and mail fraud. Doc. 1 at 1–16. Several months later, a superseding indictment was returned charging Wasserman with conspiracy to commit wire fraud and mail fraud (Count One); wire fraud (Counts Two through Six); mail fraud (Counts Seven through Ten); evasion of payment of income taxes (Count Eleven); and fraud and false statements (Counts Twelve through Eighteen). Doc. 69 at 1–25. The fraud counts were severed from the tax-related counts before trial. Doc. 376.

At the heart of the fraud counts was "FastLife," ostensibly an insurance business venture founded by Wasserman which the Government alleged was used by Wasserman to make Ponzi-style payments. Doc. 69 at 1–4. On July 20, 2021, Rossman pleaded guilty to a superseding information charging him with conspiracy

to commit wire fraud and mail fraud and one count of aiding and assisting the preparation and filing of a false and fraudulent tax return. *See* Doc. 192.

**Pre-Trial Discovery Motions**

Wasserman filed two motions in the fall of 2021 related to Rossman's health and anticipated testimony. *See* Docs. 217, 280. Both were based on a car accident Rossman suffered in 2018 and its effects on his memory and competency. *Id.*

In Wasserman's first motion, which sought a psychiatric examination of Rossman, he stated that: "During the time period at issue in this case, Mr. Rossman suffered serious injuries in a car accident, including a traumatic brain injury that . . . affected his memory. Mr. Rossman has also been diagnosed with psychiatric illnesses that . . . may affect his competency to testify." Doc. 217 at 1. Further, he added that it was his understanding that Rossman "suffers from diagnosed mental illnesses for which he is under the care of a treatment provider, and that require medication." *Id.* at 2–3.

The Government responded that courts order psychiatric examinations of witnesses rarely and with great caution. Doc. 225 at 2 (citing *United States v. Khoury*, 901 F.2d 948, 966 (11th Cir. 1990)). It also argued that a witness's competency to testify is generally a question of credibility for a jury to decide and that Rossman had been found competent to plead guilty at his change of plea hearing. *Id.* at 2–3.

The magistrate judge denied the motion, finding that Wasserman had not demonstrated any basis for a pre-trial psychiatric evaluation, and that a witness's competency to testify is generally a question for the jury. Doc. 287 at 6–8. The

magistrate judge noted that, if Rossman testified, the jury would have a "full opportunity to assess his credibility and competency through direct and cross-examination." *Id.* at 8.

Wasserman's second motion, filed in November 2021, sought to compel the names of Rossman's medical and prescription drug providers. Doc. 280. Wasserman noted that he had requested Rossman's records related to the accident and that Rossman's attorney Adam Allen declined this request. *Id.* at 1–2. The magistrate judge held a hearing on this motion on March 31, 2022, with Rossman's counsel present. Doc. 368. The motion was denied, without prejudice, upon a finding that Wasserman had provided no authority for the court to compel a co-defendant to provide discovery, let alone medical records and prescription information. Doc. 390 at 2–4.

### **Rossman's Trial Testimony**

At trial, Rossman testified over the course of three days. Docs. 749, 752, 753. Wasserman conducted a lengthy cross-examination, spanning more than five hours and covering topics including Rossman's memory, his motivation to earn a downward sentencing departure based upon assistance to the Government, his car accident, and certain risky behaviors. *See* Doc. 782. Wasserman also asked Rossman whether his memory had been affected by anything, including his car accident and associated injuries (Doc. 782 at 109–114, 115–117). He also asked about scams Rossman had repeatedly fallen victim to. *Id.* at 195–196, 250.

During the six-week trial, the Government presented the testimony of 39 witnesses and introduced more than 670 exhibits. *See* Docs. 634, 813. Defendant called

15 witnesses, 13 of whom the Court allowed to testify. Doc. 960. Additionally, two weeks into trial, Wasserman produced to the Government numerous text messages between himself and Rossman. Doc. 1017-4. Among these were several messages referencing Rossman's mental health at the time of the offense conduct. For example, on May 2, 2019, Wasserman wrote that Rossman was barred from his office because his behavior was "that of someone mentally ill." *Id.* at 3. Wasserman also wrote to Rossman: "You can't help yourself your [sic] mentally ill." *Id.* at 2. Ultimately, on May 15, 2023, Wasserman was found guilty on all of the fraud counts. Doc. 806.

### Motion for New Trial and Evidentiary Hearing

Wasserman filed the instant motion after learning of Rossman's diagnosis and medication in Rossman's sentencing memorandum on July 5, 2023. Doc. 892 at 4–5. On May 4, 2023, the twenty-third day of trial, the Probation Office issued an initial version of Rossman's Presentence Investigation Report ("PSR") for review by Rossman, his counsel, and the Government. Doc. 771. The PSR references a psychiatric evaluation conducted by Dr. Scot Machlus that was emailed to the Government on June 29, 2023, and appended to the final July 5 PSR. Doc. 843 at 26–35. On July 5, Rossman's counsel filed a sentencing memorandum in anticipation of Rossman's sentencing hearing on July 12. Doc. 845. The memorandum discusses Rossman's "undiagnosed and untreated bipolar disorder" and its contribution to his high-risk behaviors and poor decision-making. *Id.* at 2–5. It further notes that Rossman was diagnosed with bipolar disorder while on pretrial supervision, received treatment, and was prescribed "Aripiprazole (generic Abilify)." *Id*. at 8.

Wasserman filed his initial version of this Motion on August 2, 2023,[2] and the Court has since received extensive briefing on it, heard oral argument, and held an evidentiary hearing. Wasserman seeks a new trial based on *Brady*, *Giglio,* newly discovered evidence, and the violation of his Fifth and Sixth Amendment rights under the United States Constitution.

The Government's initial response notes that shortly before trial began, Rossman's counsel, Allen, called Assistant U.S. Attorney Rachelle DesVaux Bedke ("AUSA Bedke") and told her that Rossman had been evaluated by a mental healthcare provider and diagnosed with bipolar disorder. Doc. 910 at 7. He stated that a report would be submitted in connection with Rossman's sentencing hearing but did not indicate any issues with Rossman's memory or ability to testify truthfully. *Id.* Shortly thereafter, the Government met with Rossman and his counsel to review his anticipated testimony and exhibits. *Id.* The Government indicates that Rossman was able to answer questions, recount events, conversations, identify and describe documents and other records, and gave no indication of suffering from memory issues. *Id.* at 7–8. Following oral argument on this motion, the Court held an evidentiary hearing on October 23, 2023. *See* Doc. 1013.

---

[2] Defendant also filed an "amendment" that is essentially a supplement to the motion on October 6, 2023. *See* Doc. 967. In addition, he filed a supplemental memorandum of law and amended supplemental memorandum of law. Docs. 946, 947. The Court has reviewed these supplemental cases, none of which are from the Eleventh Circuit. Similarly, the Court has reviewed Defendant's "notice of additional supplemental authority from the Eleventh Circuit" (Doc. 950) and addresses those cases where relevant.

Four witnesses testified at the hearing, including a psychiatric expert retained by Wasserman, Dr. James Ballenger, Rossman's counsel Allen, AUSA Bedke, and Rossman. Doc. 1010. Allen and AUSA Bedke testified primarily to what and when the Government knew about Rossman's condition. Allen stated that he retained Dr. Machlus to evaluate Rossman in May of 2021 before his change of plea hearing. Doc. 1013 at 97. Dr. Machlus diagnosed Rossman as suffering from Bipolar I Disorder, in part based on his history of high-risk behaviors. *Id.* at 71–72, 146. Allen provided Rossman's evaluation report to Pretrial Services, and Rossman received treatment and an Abilify prescription, which he was taking during the trial. *Id.* at 101–105, 153. Allen testified that he only informed the Government of the diagnosis and medication shortly before the start of trial.[3] *Id.* at 140. AUSA Bedke corroborated this, stating that Allen mentioned the diagnosis and that he was considering requesting an updated report to use at sentencing. *Id.* at 182.

On April 16, 2023, two weeks after the trial began, Allen and Rossman met with the Government for a final trial preparation meeting, at which Allen remembers asking AUSA Bedke if she would raise the issue of Rossman's diagnosis on direct examination, because he expected Wasserman to do so. *Id.* at 142. AUSA Bedke corroborated the meeting and stated that it seemed Rossman was able to better follow the conversation thanks to his medication. *Id.* at 182. AUSA Bedke did not deny that

---

[3] According to the Government, this occurred on March 29, 2023. Allen was not certain of the precise date on which the conversation took place, but stated it was prior to Rossman's final proffer session before the start of trial. *Id.* at 109, 139, 140, 148. Regardless, it is undisputed that this exchange occurred before trial began.

Allen suggested that she ask about Rossman's mental health on direct examination. She simply did not recall it. *Id.* at 186. Allen and AUSA Bedke agree that no further details or records were provided about Rossman's mental health, and that the Government did not receive a copy of the psychiatric report prior to or during trial. *Id.* at 142, 182–183. AUSA Bedke stated she did not ask for Rossman's medical records, information on his medication, or a psychiatric evaluation. *Id.* at 110, 122, 147–148, 185. Rossman also recalled that his diagnosis was discussed with the Government prior to trial. *Id.* at 165. He also testified that he thought he told the Government about his prescription. *Id.* at 165–167.

### Dr. Ballenger's Testimony at Evidentiary Hearing

As Wasserman details in his closing argument (Doc. 1015 at 3–8), Dr. Ballenger testified to the nature of bipolar disorder, answered questions regarding proper cross-examination of a witness with bipolar disorder, the illness's progression, and discussed information contained in a psychological report on Rossman. Doc. 1015 at 3–7. In response to Wasserman's questioning, Dr. Ballenger also opined as to the impact of Rossman's illness on his credibility and whether his illness was "material." *Id.* at 7–8. After the evidentiary hearing, both sides filed extensive written closing arguments and Wasserman filed a reply. Docs. 1015, 1017, 1018.

# LEGAL STANDARD

### A. *Brady*

Pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), "the prosecution is required to disclose to the defense evidence favorable to the accused if the evidence is material to guilt or punishment." *United States v. Starrett,* 55 F.3d 1525, 1555 (11th Cir. 1995) (per curiam). To obtain a new trial on the basis of a *Brady* claim, a defendant must show that: (1) the government possessed evidence favorable to him; (2) the defendant did not possess the evidence and could not have discovered the evidence with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been revealed to the defendant, there is a reasonable probability that the outcome of the proceedings would have been different. *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002). The burden to show a *Brady* violation lies with the defendant, not the Government. *United States v. Stein,* 846 F.3d 1135, 1145 (11th Cir. 2017). Furthermore, a defendant must meet all the elements to be entitled to a new trial. *Starrett,* 55 F.3d at 1554. Exculpatory evidence or impeachment evidence can form the basis for a *Brady* violation. *See United States v. Bagley*, 473 U.S. 667, 675 (1985).

### B. *Giglio*

A *Giglio* error is a species of Brady error that "occurs when 'the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'" *Davis v. Terry,* 465

F.3d 1249, 1253 (11th Cir. 2006) (quoting *Ventura v. Att'y Gen., Fla.,* 419 F.3d 1269, 1276–1277 (11th Cir. 2005)). To establish a *Giglio* violation, the defendant must demonstrate that the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony, and that the falsehood was material. *Id.* at 1253 (quotation marks omitted). The falsehood is material if there is any reasonable likelihood that the false testimony could have affected the judgment. *Ford v. Hall,* 546 F.3d 1326, 1331–1332 (11th Cir. 2008) "The could have standard requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt." *Guzman v. Sec'y, Dep't of Corr.,* 663 F.3d 1336, 1348 (11th Cir. 2011) (quotation omitted).

### C. Rule 33 and Newly Discovered Evidence

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Eleventh Circuit describes this as a "broad standard." *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994). Thus, the Court considers whether the verdict must be set aside in the interest of justice based on Defendant's arguments. *United States v. Green*, 275 F. App'x 898, 899 (11th Cir. 2008). "The decision to grant or deny the new trial motion is within [the] sound discretion of the trial court . . ." *Vicaria,* 12 F.3d at 198 (quoting *United States v. Wilson*, 894 F.2d 1245, 1252 (11th Cir. 1990)).

To merit a new trial pursuant to Rule 33 based on newly discovered evidence, the defendant must show that: (1) the evidence was discovered following trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is of such a nature that a new trial would probably produce a different result. *See United States v. Lee,* 68 F.3d 1267, 1273 (11th Cir. 1995). The defendant must satisfy each of these elements to warrant relief. *See United States v. Williams,* 816 F.2d 1527, 1530 (11th Cir. 1987). Motions for a new trial based on newly discovered evidence are highly disfavored, and the Eleventh Circuit instructs that district courts should use great caution in granting such motions. *See United States v. Jernigan,* 341 F.3d 1273, 1287 (11th Cir. 2003) (internal citations omitted).

## DISCUSSION

Defendant moves for a new trial on the grounds that: (1) the Government violated *Brady*; (2) it violated *Giglio*; (3) based on newly discovered evidence; and (4) based on the claim that his Fifth and Sixth Amendment rights were violated. Each of the claims is based on the assertion that he was prejudiced at trial by the fact that Rossman's bipolar diagnosis and medication was not disclosed to him until after trial.

Although each of Wasserman's claims has its own legal standard, there is significant overlap in terms of the analysis, and most of his claims fail for similar reasons. The legal standards overlap as follows—under *Brady*, a defendant must show that had the evidence been revealed to him, there is a reasonable probability that the outcome of the proceedings would have been different. Under *Giglio*, he must show a

reasonable likelihood that false testimony could have affected the judgment of the jury. Under the newly discovered evidence doctrine, he must show that he discovered evidence post-trial that is not merely cumulative or impeaching, is material, and is of such a nature that a new trial would probably produce a different result. For motions pursuant to Fed. R. Crim. P. 33, he must show that a new trial is warranted in the interest of justice. As discussed below, the *Giglio* claim fails at the outset because Wasserman does not identify any false testimony. Each of the remaining claims fail for a similar reason (as would the *Giglio* claim if it made it that far)—because Wasserman has not established that the additional impeachment evidence about Rossman would have, with any reasonable likelihood, had an impact on the outcome of the trial.

A. *Brady*

Wasserman moves for a new trial under *Brady* on the grounds that the Government failed to disclose Rossman's bipolar diagnosis, which he suffered from at the time of the offense and for which he was taking medication during trial. *See* Doc. 1015 at 1, 14–29.[4] The Government responds that the motion should be denied because Wasserman fails to establish that it possessed and suppressed favorable evidence (which he could not himself obtain) or that had the evidence been revealed to him, there is a reasonable probability that the outcome of his trial would have been different. Doc. 1017 at 1–2, 30–43.

---

[4] *See also* Docs. 892, 929, 967, 1018.

Wasserman establishes three of *Brady's* four elements. That is, that the Government possessed evidence – impeachment evidence -  favorable to him, that he did not possess the evidence and could not have discovered it with reasonable diligence, and that the prosecution suppressed the favorable impeachment evidence. However, Wasserman's request for a new trial is nevertheless due to be denied because he fails to establish materiality—i.e., that there is a reasonable probability, had he known of Rossman's diagnosis and medication,[5] that the outcome of the trial would have been different.

**Government Possession of Favorable Evidence**

*Brady*'s first prong asks whether the Government possessed evidence favorable to the defendant. Wasserman argues that the hearing established that the Government knew prior to trial of Rossman's diagnosis and that he was taking medication. Doc. 1015 at 14–15. Wasserman cites Dr. Ballenger's testimony on the significance of the condition, medications, and expert testimony regarding bipolar disorder in his closing argument. *Id.* at 16. He argues this information would have "placed Mr. Rossman's conduct into a different context and explained the decisions he made." *Id.* at 18. Wasserman notes that, on cross-examination, he could have taken a different approach to asking Rossman about his grandiose and delusional thinking and the scams he fell victim to during the time of the offense conduct, had he known about the illness. *Id.* at 18–19.

---

[5] The Court considers the effects of all the alleged *Brady* evidence cumulatively, not item by item. *See Kyles v. Whitley,* 514 U.S. 419, 436 (1995).

The Government responds that "the details" of Rossman's condition and medication were not within its possession or control until after Rossman testified and that Wasserman had the same ability to move the Court for disclosure of pretrial services or probation records that the Government did. *See* Doc. 1017 at 30. It also argues that Rossman's diagnosis and prescription information were not favorable to Wasserman, because they do not reflect positively on him or negate the overwhelming evidence against him. *Id.*

First, the argument that Wasserman could have moved the Court for disclosure of these records is more pertinent to the reasonable diligence requirement of *Brady*. And while it may be true that the Government did not know the specific details of Rossman's mental health condition until after trial, it is undisputed that it knew of the bipolar diagnosis and the fact Rossman was on medication before trial (as the Government concedes, *see* Doc. 1013 at 182) and that is at the core of Wasserman's motion. Indeed, Allen suggested that AUSA Bedke ask Rossman about the medication at trial. And the Government knew, given Wasserman's pre-trial discovery motions related to Rossman's mental health, that Rossman wanted this information. Therefore, the Government's argument is not persuasive.

Nor does the Court agree that Wasserman's *Brady* motion must be rejected because the evidence isn't directly favorable to him. The Government provides no authority supporting such a strict definition of favorable evidence in the *Brady* context, and it is well-settled that impeachment evidence can form the basis for a violation. *Bagley*, 473 U.S. at 675. Further, in support of his argument, Wasserman explains why

he believes the evidence would be favorable and cites to Dr. Ballenger's testimony on the complexity and possible symptoms of Bipolar I Disorder, as well as the ways in which the disorder can affect an individual's memory.

Importantly, this prong asks only whether the evidence would have been favorable to Wasserman. *How* favorable it would have been is properly at issue in the materiality prong of the analysis. Thus, Wasserman has cleared the relatively low hurdle of showing that the evidence would have been favorable to him. *See Kyles v. Whitley,* 514 U.S. 419, 451 (1995) (rejecting the state's argument that the evidence was "neither impeachment nor exculpatory evidence" because the jury might not have substantially credited it; according to the Court, "[s]uch [an] argument . . . confuses the weight of the evidence with its favorable tendency"); *see also Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 286 (3d Cir. 2016).

**Possession of the Evidence by Defendant and Reasonable Diligence**

On this prong, Wasserman argues that he did not possess evidence of Rossman's mental illness and could not have obtained it with reasonable diligence. Doc. 892 at 19; Doc. 1015 at 19–22. He claims that he used every tool available to obtain such information, "went above and beyond," and that the Government and Rossman's attorneys "stood in his way." Doc. 892 at 19; Doc. 1015 at 19–20. He dismisses the contention that he could have asked Rossman whether he suffered from mental illness at trial as "resoundingly rebutted by both the procedural history of this case and the expert testimony." Doc. 1015 at 20. According to Wasserman, because the Government and Rossman's counsel told the magistrate judge that there was no

evidence Rossman was mentally ill, he had no good-faith basis to ask about mental illness or medication. *Id.* Wasserman also asserts the Government accused him of witness intimidation for filing pre-trial discovery motions. *Id.*

The Government disagrees. *See* Doc. 1017 at 31. First, it argues Wasserman already had information that he believed demonstrated Rossman's mental health issues. *Id.* Specifically, it cites an October 29, 2021, hearing wherein counsel for Wasserman referenced "specific information" that Rossman was suicidal and "had things going on at the time." Doc. 1016 at 34–35. Furthermore, the Government notes Wasserman produced text messages that constitute ample basis to ask Rossman about his mental health, as contemplated during the pretrial discovery hearings. *Id.* at 18, 19, 21, 23. Thus, it concludes that Wasserman had every right to ask Rossman about his mental health, medications, or other such issues at trial and yet chose not to do so. Therefore, the Government argues he failed to exercise reasonable diligence.

Neither Wasserman nor the Government cite to authority that clearly lays out the contours of *Brady*'s "reasonable diligence" requirement. And the Eleventh Circuit caselaw found by the Court provides little color. One case, for example, simply states that *Brady* does not require the government to turn over information which, "with any reasonable diligence, [the defendant] can obtain himself." *Jarrell v. Balkcom*, 735 F.2d 1242, 1258 (11th Cir. 1984) (citation omitted). Further, *Brady*, *Kyles*, and the Supreme

Court's other seminal *Brady* decisions do not set forth a reasonable diligence prong in their analysis.[6]

Nevertheless, this Court is bound by Eleventh Circuit precedent, which includes such a requirement. However, the Government's argument that Wasserman could have discovered Rossman's diagnosis and medication information through due diligence is ultimately unpersuasive.

Both Defendant and the Government are correct on certain points. First, the Government is right that no prior order of the Court or clearly applicable legal doctrine barred Wasserman from asking Rossman, at trial, whether he was or had ever been mentally ill, or whether he was on any medications on the day of testimony (although Wasserman vociferously argues he could not have done so based on his pre-trial discovery motions being denied). The Court notes that the pre-trial discovery orders suggest that this was an issue for examination at trial.

Nevertheless, the record of proceedings before the Court does not support or otherwise establish that Wasserman failed to exercise reasonable diligence. Other cases where *Brady* challenges were denied based on a defendant's lack of reasonable

---

[6] Some academic commentators argue that the "defendant due diligence rule" effectively "excuse[s] the prosecutors' failure to disclose exculpatory evidence on the theory that the defendant either knew or could have known of that evidence through due diligence." *See* Kate Weisburd, Prosecutors Hide, Defendants Seek: The Erosion of Brady Through the Defendant Due Diligence Rule, 60 UCLA L.Rev. 138, 141 (2012). And in fact, the Supreme Court has never explicitly adopted a defendant due diligence rule in a *Brady* case, *id.* at 147, although "[a]ll federal courts of appeal, except the Tenth and D.C. Circuits, apply some form of the defendant due diligence rule," *id.* at 153 & n.80 (citing cases); *see also United States v. Nelson,* 979 F. Supp. 2d 123, 133 (D.D.C. 2013).

diligence are distinguishable. In *Stein,* 846 F.3d at 1146, for example, the Eleventh Circuit held that a defendant failed to show he was unable to locate a certain document with reasonable diligence because it "was a publicly available document filed with a public agency." In other cases, *Brady* arguments were rejected on this basis because the information was already possessed by defense counsel, *United States v. Valera,* 845 F.2d 923, 928 (11th Cir. 1988), available through legal research, *United States v. Hansen,* 262 F.3d 1217, 1235 (11th Cir. 2001) or already known to the defendant, *Maharaj v. Sec'y for Dep't of Corr.,* 432 F.3d 1292, 1315 (11th Cir. 2005). Based on the record and caselaw reviewed by the Court, Wasserman did not fail to exercise reasonable diligence as defined in *Brady* and its progeny—because Rossman's diagnosis and prescription information were not publicly available, already in defense counsel's possession, known to the Defendant, or otherwise ascertainable through reasonable diligence. Therefore, Wasserman has satisfied this element.[7]

---

[7] Even if asking Rossman at trial about his illness qualified as "reasonable diligence" under *Brady*, Wasserman's argument that he "could not have effectively cross-examined Mr. Rossman about his Bipolar Disorder" "on the fly" (Doc. 1015 at 21) has merit, and such an argument has been credited by a district court in this Circuit. *See United States v. Thevis,* 84 F.R.D. 47, 53 (N.D. Ga. 1979) ("Independent investigation is the only effective method of utilizing this information, and independent investigation requires time."); *see also United States v. Pollack,* 534 F.2d 964, 973 (D.C. Cir. 1976) ("Disclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure.").

**Reasonable Probability that the Outcome of the Proceedings Would Have Been Different**

Wasserman's request for a new trial under *Brady* fails on this element because he does not establish that, had the impeachment evidence been revealed to him, there is a reasonable probability of a different outcome at trial.

He argues that the outcome would have been different had the jury known of the diagnosis and medication because Rossman was the only co-defendant, the only co-conspirator, and suffered from untreated bipolar disorder at the time of the offense conduct. Doc. 1015 at 24–29. He further argues that *United States v. Lindstrom*, 698 F.2d 1154 (11th Cir. 1983) and *United States v. Robinson*, 583 F.3d 1265 (10th Cir. 2009) show that this type of evidence is material. *Id.* at 25–28. Here, as in *Robinson*, Wasserman argues that the jury was unable to gain a complete and accurate picture of Rossman's credibility, and that the "Fifth and Sixth Amendments," in addition to "[f]airness and justice" require that such mental health information be disclosed. *Id.* at 28. Further, he cites portions of Dr. Ballenger's testimony at the evidentiary hearing in which he opined that such information would be material.[8] *Id.*

The Government responds that neither Rossman's diagnosis nor his prescription information: (1) reflect positively on Wasserman; (2) negate the

---

[8] Dr. Ballenger, while undisputedly an expert on psychiatry and bipolar disorder specifically, is not an expert on the law or the standard for determining materiality pursuant to *Brady*. Therefore, his opinions on this legal determination are not controlling on this issue. Rather, the Court determines whether the evidence is material under *Brady* by asking whether the undisclosed information is sufficient to undermine confidence in the outcome. *United States v. Scheer,* 168 F.3d 445, 451–52 (11th Cir. 1999).

voluminous evidence of his development, operation, and control of FastLife; or (3) erase the personal benefits Defendant and his family enjoyed at the expense of the investors and others who suffered financial loss based on Wasserman's conduct. *Id.* at 32–33. Further, it argues that the diagnosis was based largely on Rossman's involvement in high-risk activities, which was explored at trial by Wasserman. *Id.* at 18–23, 32. Any additional impeachment along these lines would have been cumulative, the Government argues, and Wasserman fails to explain how his expert testimony would have been admissible.[9] *Id.* at 36. Additionally, it argues that Wasserman fails to explain how testimony about the hypothetical effects of bipolar disorder and Abilify would have changed the result of his trial considering the evidence presented on Rossman's symptoms, including his impulsiveness. *Id.* at 36. And, the Government argues that Dr. Ballenger's non-specific testimony does not change the analysis, and that Rossman's testimony was far from the only evidence of a conspiracy. *Id.* at 36–43. Wasserman responds that the expert testimony was specific, non-hypothetical, and that the Government has failed to "rebut" or "refute" Dr. Ballenger. Doc. 1018 at 5–9, 16–18. He also reiterates many of his previous arguments, including that the evidence was material based on *Lindstrom*. *Id.*

---

[9] The Government's argument regarding admissibility doesn't carry much weight, as "admissibility is not the touchstone (or a requirement) of *Brady* materiality," and exculpatory evidence in an inadmissible form can be used by the defense to uncover evidence that is admissible to be used at trial. *See Green v. Sec'y, Dep't of Corr.,* 28 F.4th 1089, 1167 (11th Cir. 2022), *cert. denied sub nom. Green v. Dixon,* 143 S. Ct. 982, 215 L. Ed. 2d 106 (2023)

"[T]he mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish materiality in the constitutional sense." *United States v. Bodison,* 523 Fed. Appx. 601, 608 (11th Cir. 2013) (per curiam) (citing *United States v. Agurs,* 427 U.S. 97, 109–10, (1976)). Although a defendant need not show that disclosure of the suppressed evidence would have definitively resulted in acquittal, he must establish that the undisclosed information is sufficient to undermine confidence in the outcome. *United States v. Scheer,* 168 F.3d 445, 451–452 (11th Cir. 1999).

Here, Wasserman has not established a reasonable probability that earlier disclosure of Rossman's diagnosis and prescription information would have changed the outcome at trial. And this undisclosed evidence does not undermine the Court's confidence in the verdict. Extensive testimony and documentary evidence corroborated much of Rossman's testimony and provided the jury with a plethora of evidence of the unlawful agreement between Wasserman and Rossman as related to the conspiracy count, and the elements of the other counts charged.

In his initial motion, Wasserman listed fourteen questions he would have asked Rossman had he known about the diagnosis and medication. Doc. 892 at 18. These questions illustrate one reason why the diagnosis and medication information are not material under *Brady.* The questions revolve around Rossman's irrational behavior caused by his mental illness, delusional thinking, interactions with investors outside Wasserman's presence, medication Rossman was taking, and its possible effects on his memory. Doc. 892 at 18. However, as the Government points out, much of this was

already covered on Rossman's cross-examination in detail.[10] *See* Doc. 782 at 109–114, 115–117, 195–196.

Further, while the Government concedes that Rossman's testimony was a "crucial aspect of [its] case" (Doc. 1017 at 39), it argues that his testimony was far from the only evidence of a conspiracy. Doc. 910 at 23. In addition, it argues that Rossman's testimony was largely corroborated by documentary evidence and other testimony throughout the trial.

The Government is correct. The following is just some of the additional evidence provided at trial and detailed in the Government's submissions. First, investor G.H. testified that Wasserman and Rossman were working together to secure her investment, and W.M. (son of M.M.) testified to meeting with both men regarding his mother's investment.[11] Several victim-investors described the investment pitch they received, which generally matched Rossman's testimony. Rossman also testified regarding which investors he solicited to invest in FastLife and which were solicited

---

[10] Additionally, as the Government points out, the fact that Wasserman could test Rossman's memory and ask him about medical issues at trial was repeatedly mentioned at the hearings on his discovery motions.

For example, Rossman's counsel noted that Wasserman could cross-examine Rossman on his memory issues, examinations, and/or related interviews at trial, and did not need medical records to do so. Doc. 1016 at 18. Additionally, the Government noted that such questions were at the heart of what "cross-examination is for" (*Id.* at 21) and the magistrate judge's order reiterated that whether a witness is competent to testify is generally a question of credibility for the jury. Doc. 287 at 7–8. This is relevant to the materiality analysis as far as it shows that Rossman's illness was not a complete surprise to Wasserman, based on the prior motions and text messages Wasserman himself produced accusing Rossman of being mentally ill, and that this was fertile ground for cross-examination.

[11] The Court notes that Wasserman's pleadings do not take issue with the Government's description of the corroborating evidence and testimony.

by Wasserman. Rossman testified that he pitched the investment to J.L., A.R., L.A., I.D., R.L., R.C. and others. Doc. 781 at 28. Those five investors all corroborated that Rossman solicited their investments. *See, e.g.,* Doc. 901 at 7–9; Doc. 784 at 9; Doc. 780 at 6–9. In addition, Rossman testified he was not involved in the solicitation of P.G. (Doc. 781 at 28), and she confirmed that Wasserman had solicited her investment.

Various investors also corroborated Rossman's testimony that they had not personally filled out paperwork. *See, e.g.,* Doc. 784 at 19. Additionally, his testimony that he received 5% of each investment that he brought into FastLife was corroborated by bank records. *Compare* Doc. 781 at 96 *with* Doc. 809-549, Government's Exhibits 1B and 1C. Those records also corroborated Rossman's testimony that he did not have access to the Phillip Roy Financial Consultants, LLC-related bank accounts. *See id.*; *see also* Doc. 809-525 (text message from Rossman to Wasserman stating "I am CFO only in name sir.").

Rossman's testimony about FastLife's dire financial situation and Wasserman's response to that situation were also largely corroborated. Rossman testified that he was instructed by Wasserman to deal with creditors, although he had no knowledge or understanding of FastLife's finances, which was corroborated via email communications. *See e.g.,* Docs. 809-316, 809-368. He also testified about the nearly $4,000,000 adjustment Wasserman directed him to make to the business plan or financial statements. Doc. 781 at 79–84; Doc. 783 at 65. This testimony was corroborated by versions of the business plans, some of which contained the adjustment (such as the February 2018 plan provided to the Florida Office of Financial

23

Regulation ("OFR"), (Doc. 809-54) and some of which did not (such as the February 2018 Plan provided to investor J.L., Doc. 809-111, and the February 2018 Business Plan provided to investor A.R., Doc. 809-139). Rossman also testified that he never told any investor that the company was in dire financial straits, (Doc. 782 at 29, 32, 34, 37), which was confirmed by the various investors who testified at trial and shown to be inaccurate in emails. *See also* Docs. 809-520, 809-521, 809-522, 809-523, 809-524 (emails discussing FastLife's financial situation). Rossman's testimony that Wasserman instructed him to put investors at ease was similarly corroborated by testimony and documentary evidence (*see* Doc. 809-517).

Finally, Rossman testified to the backdated executive compensation agreement Wasserman provided to OFR. *See* Doc. 782 at 101–102. That testimony was corroborated by other evidence. For example, regarding a memorandum provided to M&A Services/Capital, a firm that helps raise capital for businesses in the insurance industry (Doc. 809-344), Rossman testified that he did not report Wasserman's compensation because he had no information about it. Doc. 782 at 45. An M&A employee testified that if there were a compensation agreement, tax liens, judgments, and/or FastLife business debts—they should have been disclosed to potential investors. As to the creation of the compensation agreement, former bookkeeper S.L. and former employee V.U. both testified that they had never seen Wasserman's purported compensation agreement (Doc. 809-55) until after OFR issued a subpoena to PRFC. S.L. testified she used the compensation agreement to book defendant Wasserman's salary in their financial report after she had already completed the 2016

report. *See* Doc. 779 at 95; *see also* Doc. 809-500. FastLife employee V.U. similarly testified she had not seen the agreement before she was requested to scan and email it in April 2018. Doc. 809-601.

In sum, and as separately detailed in the Court's Order denying Wasserman's motion for judgment of acquittal, significant evidence established that Wasserman and Rossman agreed to accomplish what they knew was an unlawful plan to use false and fraudulent pretenses, misrepresentations, or promises and omissions about material facts to defraud the FastLife victim-investors, and that they used wire transmissions, mailings, and FedEx shipments to help carry out the scheme. Any additional impeachment value created by Rossman's bipolar disorder diagnosis simply does not undermine confidence in the outcome or create a reasonable doubt of guilt that would not otherwise exist. *United States v. Kubiak,* 704 F.2d 1545, 1550–1551 (11th Cir. 1983). Additionally, based on review of Rossman's cross-examination, this evidence would not add significant new information to the case, or any significant evidence tending to establish Wasserman's lack of culpability, innocence, or any other viable defense.

Many of the questions Wasserman indicates he would have asked Rossman based on this evidence would be cumulative or redundant. At trial, Wasserman cross-examined Rossman about memory problems, asking whether his memory was affected by a car accident or "by anything?" Doc. 782 at 109–114. Further, Wasserman honed in on Rossman's high-risk behaviors (which Dr. Machlus cited as indicative of bipolar disorder), for example asking whether FastLife caused Rossman to lose $200,000 to scammers. *See id.* at 195–196, 250–252. Therefore, in addition to the fact that the

Government's evidence went far beyond Rossman's testimony, Wasserman asked many of the questions he would have asked with the benefit of the evidence at issue, which weakens his materiality argument.

Dr. Ballenger's testimony at the evidentiary hearing, while illuminating as to the nature of bipolar disorder, does not change the materiality analysis either. He noted in his testimony that bipolar disorder impacts individuals differently on a case-by-case, time-by-time, and person-by-person basis. Doc. 1013 at 80. He also noted that a given case could be moderate to serious (*Id.* at 81), and conceded that he had not met Rossman or looked at the indictments, transcripts of proceedings, or other legal documents. *Id.* at 79, 83.

The Government cites *United States v. Baxter*, 761 F.3d 17, 23–24 (D.C. Cir. 2014), and *United States v. George*, 532 F.3d 933 (D.C. Cir. 2008) as support for its argument. *Baxter* is readily distinguishable as it pertains to a Defendant's motion to vacate his convictions under 28 U.S.C. § 2255. But the case has some factual and legal similarities to this case. Defendant Baxter argued that the government violated Brady when it failed to turn over evidence that a codefendant suffered from bipolar disorder. 761 F.3d at 23. The D.C. Circuit found that Baxter failed to state a *Brady* claim that jurists of reason would find debatable, and therefore denied his request for a certificate of appealability on several grounds. *Id.* at 24. First, it found that Baxter failed to show how evidence of the condition might have changed the outcome of his trial, besides a conclusory claim that he could have used it for impeachment. Specifically, the defendant failed to describe how evidence of the illness would be useful or cast doubt

on the co-defendant's ability or willingness to tell the truth. *Id.* The court also noted that Baxter's co-defendant was extensively cross-examined, particularly on the ground that her desire for a reduced sentence gave her a motive to inculpate Baxter. *Id.* Moreover, the court found that that even if the evidence could have been used to impeach the witness, the evidence against Baxter was overwhelming. *Id.*

Rossman, like the witness in *Baxter*, was subject to extensive cross-examination, including based on his motive to inculpate Wasserman to get a sentence reduction, memory issues, and the very high-risk behaviors that contributed to his diagnosis. Like *Baxter*, any additional impeachment along the lines of what Wasserman suggests would add little to his case and be largely cumulative of the cross examination he conducted at trial. *See Aldridge v. Dugger*, 925 F.2d 1320, 1326 (11th Cir. 1991) (rejecting a defendant's *Brady* argument on the grounds that cumulative impeachment evidence does not establish materiality).[12]

Further, Wasserman cites *United States v. Robinson,* 583 F.3d 1265, 1271–1272 (10th Cir. 2009), in which the Tenth Circuit reversed a district court's refusal to allow a defendant access to a testifying witness's mental health records. He argues that here,

---

[12] In *United States v. George*, 532 F.3d 933 (D.C. Cir. 2008), the Circuit Court held that the district court did not err in barring cross-examination about a witness' bipolar disorder because nothing in the defendant's proffer indicated that it "would reasonably cast doubt on her ability or willingness to tell the truth," noting also that "[m]ental illness is not a generic badge of incompetence or dishonesty." 532 F.3d at 938. The procedural posture here is different, as this Court did not bar any attempts to cross-examine Rossman on his mental illness at trial, as Wasserman made no such attempt. However, with the benefit of the hearings and Rossman's testimony at trial, there is nothing in this case either to indicate that Rossman's illness would cast any doubt on his ability and willingness to tell the truth at trial.

as in *Robinson*, the jury was unable to gain a complete and accurate picture of Rossman's credibility, and that the "Fifth and Sixth Amendments," in addition to "[f]airness and justice" require that such mental health information be disclosed. Doc. 1015 at 28. The Court agrees with the Government that *Robinson* is readily distinguishable based on the facts that the witness there was the "only witness who testified about Robinson's possession," "was essentially uncorroborated," had been a heavy drug user for years, abused alcohol, cannabis, opioids, benzodiazepine, Valium, Klonopin, Darvocet, and Hydrocodone, and had a "long history of mental illness" which included auditory and visual hallucinations. *Id.* at 1271–1272. The instant case is distinguishable because a plethora of evidence supports Wasserman's participation in the conspiracy. Furthermore, Rossman's history of mental illness is much less severe than the witness in *Robinson*.

Finally, the Court addresses Wasserman's arguments that his pre-trial discovery requests for information about Rossman's mental health at the time he worked at FastLife were specific and relevant, and that the prosecution's failure to make a defendant aware of such information in response to a request is "seldom, if ever, excusable." Doc. 892 at 7 (citing *Bagley*, 473 U.S. at 681).

Wasserman overlooks a simple issue of chronology. His motions were filed years before the Government learned of Rossman's treatment. He also lambasts the Government for their response to his discovery motions, which stated that they had no evidence suggesting Rossman was incompetent, suffered from any diagnosed mental health illness, or was required to take medication for such an illness. Based on

the record before the Court, including the testimony elicited at the evidentiary hearing, the Government's responses are accurate,[13] and Wasserman provides no evidence to the contrary.

In sum, the evidence corroborating Rossman's testimony and Wasserman's participation in the conspiracy was overwhelming, any additional impeachment value would be largely cumulative of the cross-examination that already occurred at trial, and the fact that Rossman had been diagnosed with bipolar disorder and was on medication for it does not "undermine confidence in the outcome" of the proceedings. *See Bagley*, 473 U.S. at 682. Therefore, the evidence is not material under *Brady*, and the motion for new trial is due to be denied.

B.  *Giglio*

Wasserman's *Giglio* claim fails as well. Wasserman argues that the Government knew portions of Rossman's testimony were false, misleading, and material. Doc. 892 at 26–32; Doc. 1015 at 29–33. The Government responds that there is nothing in the record to establish that Rossman was untruthful, and that because Wasserman has not established perjured testimony, the Court need not address materiality. Doc. 1017 at 43–44. Wasserman replies that the Government's response is not accurate, and that

---

[13] The Government states that at no time during the pendency of these motions did they have any information indicating that Rossman suffered from memory problems because of his car accident or any other condition. Doc. 910 at 6. Nor did they know Rossman had been referred for a forensic psychological evaluation or possess any records or information that it could have turned over in discovery as it related to this issue. *Id.* at 6–7.

Rossman's testimony has not been consistent. Doc. 18 at 19–21. He asserts that the Government knew or should have known it was false or misleading. *Id.* at 20–21.

To prevail on a *Giglio* claim, a defendant must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) that such use was material, i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment. *Ford,* 546 F.3d at 1326; *accord Guzman* 663 F.3d at 1348. Once a defendant satisfies the first element, "[t]he could have standard requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt." *Id.* (quoting *Smith v. Sec'y, Dep't of Corr.,* 572 F.3d 1327, 1333–1334 (11th Cir. 2009)). In the *Giglio* context, the suggestion that a statement may have been false (or misleading) is insufficient; the defendant must conclusively show that the statement was actually false. *See Moon v. Head,* 285 F.3d 1301, 1315 (11th Cir. 2002); *Brown v. Head,* 272 F.3d 1308, 1317–1318 (11th Cir. 2001).

Thus, Wasserman must prove that the prosecution's case included perjured testimony. He does not even come close to doing so. To establish that Rossman committed perjury, Wasserman points the Court to a line of cross examination regarding Mr. Rossman's memory. *See* Doc. 892 at 26–32; Doc. 1015 at 29–33. He argues that: (1) Rossman's testimony about his involvement in the gold investment scam was misleading because "the jury was left with the impression [he] engaged in this strange behavior because FastLife was out of money;" (2) Rossman's testimony about misrepresentations to investors was misleading because he did not affirmatively

mention his mental illness; and (3) the Government failed to correct these misstatements. *Id.*

However, the Government is correct that there is nothing in the record to establish perjured testimony during this or any other line of questioning, and Wasserman fails to point to any false statements that could support a *Giglio* claim, even construing his pleadings liberally. As an example of the deficiencies in his claims, Wasserman argues that the Government violated *Giglio* because Rossman "clearly presented to the jury that his mind and memory during the time he worked at FastLife was no different than anybody else's, and any mental or memory issues he suffered from were just like anybody else's problems." Doc. 892 at 28. He claims that this has been proven false based on Rossman's bipolar diagnosis and an expert letter Wasserman provides. *See* Doc. 893-1 at 331. The vague assertion that Rossman committed perjury by not discussing his mental illness in response to unrelated questions does not prove that there was any perjured testimony, and the remaining scattershot claims are similarly deficient. Given that Wasserman fails to establish even a single instance of perjured testimony, the Court need not address the materiality element.

C. *Newly Discovered Evidence*

Wasserman concludes his motion by moving for a new trial, pursuant to Fed. R. Crim. P. 33, based on newly discovered evidence regarding Rossman's diagnosis and prescription, in addition to *Brady*. Doc. 892 at 32. Wasserman fails to develop this argument in his initial motion. However, he lays out his argument in his reply. *See*

Doc. 929 at 5–11.[14] Specifically, he argues that he learned of Rossman's mental illness and medication after trial, did everything he could to discover it earlier, that the newly discovered evidence would not have been merely cumulative or impeaching, that the evidence was material, and that it would have affected the outcome of the trial. *Id.*

To merit a new trial based on newly discovered evidence, a defendant must show that: (1) the evidence was discovered following trial; (2) he exercised due care to discover the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is of such a nature that a new trial would probably produce a different result. *See Lee,* 68 F.3d at 1273.

As discussed above pursuant to *Brady*, the evidence of Rossman's condition and treatment would not create a *reasonable possibilit*y of a different outcome at trial. Therefore, Wasserman has clearly failed to show that a new trial would *probably* produce a different result. Additionally, the evidence would largely be impeaching and merely cumulative. Therefore, this basis for relief is unavailing.

D. *Miscellaneous Claims*

Wasserman briefly puts forward several other unpersuasive claims. First, he argues that he should be granted a new trial in the interest of justice because his Fifth and Sixth Amendment rights were violated. Doc. 967 at 3–5; Doc. 1015 at 33–38. He also argues that, pursuant to *Lindstrom*, if the Court had known of Rossman's mental

---

[14] Wasserman does not mention these grounds for relief in his post-evidentiary hearing closing argument or response to the Government's closing argument. Docs. 1015, 1018.

health records, it would "undoubtedly have ordered that those records be produced." Doc. 1015 at 33.

Wasserman pairs his Fifth and Sixth Amendment claims together with his *Giglio* claim. Doc. 892 at 28–32. To the extent this is separate from the *Giglio* claim, the request for relief will be denied because no evidence or legal authority establish that a new trial is called for in the interest of justice. Additionally, *United States v. Lindstrom,* 698 F.2d 1154 (11th Cir. 1983), the central case that Wasserman relies on, is distinguishable. In *Lindstrom,* the defendant-appellant claimed she was improperly prohibited from questioning a Government witness regarding prior psychiatric treatment and confinement and denied access to medical records suggesting that the witness suffered from psychiatric illnesses. *Id.* at 1159. The defendant had learned, from public sources and records, that the witness had been hospitalized following a suicide attempt, previously offered someone money to commit a murder, and had been involuntarily committed, in addition to other medical information. *Id.* at 1161–1162. Nevertheless, the trial court, out of concern that the defense would attempt to put the witness on trial, placed extremely narrow limits on cross-examination. *Id.* at 1162–1163.

The Eleventh Circuit reversed, finding that the trial court abused its discretion in violation of Supreme Court and Circuit authority on the right of confrontation and the right to examine the psychiatric history of adverse witnesses. *Id.* at 1163. Unlike in *Lindstrom*, however, Wasserman made no attempt to cross-examine Rossman on any mental health issues, and there were no limits placed on cross-examination by the

Court. Wasserman himself states that "[h]ad the Court known the facts regarding Mr. Rossman's mental illness . . . [it] would have been bound to grant [Wasserman] access to Mr. Rossman's medical records . . . pursuant to *Lindstrom*." Doc. 967 at 5. The Court was not presented with these facts and made no such ruling. Therefore, *Lindstrom* is inapposite, and the interest of justice does not otherwise require a new trial.[15]

Finally, to the extent Wasserman intended to otherwise argue for a new trial in the interest of justice pursuant to Rule 33, rather than *Brady*, *Giglio*, or based on newly discovered evidence, the Court rejects all such arguments because "the interest of justice" does not warrant a new trial in this case. Fed. R. Crim. P. 33(a). The evidence against Wasserman was overwhelming, including as it relates to Rossman's role in the scheme, and this additional impeachment evidence would have done little to help his case at trial. And as previously discussed, Wasserman cross-examined Rossman on his risky behaviors, health issues, and memory issues. Therefore, Wasserman fails to show that the interest of justice requires a new trial. Additionally, because the Court rejects each of Wasserman's various claims for relief in this motion, there is no need to address his request for dismissal of the charges with prejudice rather than a new trial. Doc. 892 at 2, 32. Wasserman's closing argument also states that if "the Court believes

---

[15] Wasserman also cites *Greene v. Wainwright,* 634 F.2d 272 (5th Cir. 1981) in a supplemental memorandum. Doc. 950 at 2. Like *Lindstrom*, *Greene* is distinguishable from the facts here because the *Greene* court barred the defendant from asking a witness about his mental health and "certain bizarre criminal actions." *Greene*, 634 F.2d at 274. This Court placed no such limitation on cross-examination.

more evidence is necessary on the motion" than was elicited at the evidentiary hearing, he renews his motions for disclosure of medical records. Doc. 1015 at 38. There is no need for any further evidence, so this request is denied.

Accordingly, it is hereby **ORDERED:**

1.      Defendant's Motion for a Dismissal of the Conspiracy and Fraud Charges or a New Trial Based on Newly Discovered Evidence and Request for Evidentiary Hearing (Doc. 892) and his Amended Motion (Doc. 967) are **DENIED.**

**DONE** and **ORDERED** in Tampa, Florida on January 11, 2024.

*Charlene Edwards Honeywell*

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties