**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA

v.                                                          Case No. 8:20-cr-207-CFH-NHA

PHILLIP ROY WASSERMAN

_____/

**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER**
**JURISDICTION BASED UPON FRAUD OF THE COURT**

**DEFENDANT** moves this court to dismiss counts 1-11 of the judgement based upon Rule 12(b)(2).

Defendant cites **U.S. v. Scott**, 61 F. 4th 855, (11th Cir. 2023) (attached) which quotes Rule 12(b)(2) and states that a motion that the district court lacks jurisdiction may be made at any time while the case is pending.

This motion is differentiated from Defendant's Rule 33 motion which is for an new trial and/or dismissal. This motion is for an absolute dismissal.

Defendant's case was rife with fraud upon the court. The suppression of Rossman's severe mental illness, his use of anti-psycotic drugs medication while testifying and his perjured uncorrected <u>Napue</u> and <u>Glossup</u> violation testimony which was capitalized upon by the government. In addition there is the newly discovered exculpatory evidence of the FBI involvement and refusal to pursue the case against the Defendant, which are several of the grounds in Defendant's Rule 33 motion.

Defendant reincororates the facts and case law cited in his Rule 33 motion as to lack of jurisdiction by the IRS and the agents. Tracing that back to the indictment, the IRS had no jurisdiction to go before the Grand Jury on counts 1-11 nor act as law enforcement or case agents during the trial. Based upon also a fruit of the poisonous tree argument, any actions that followed were illegal.

If the Grand Jury and the indictment lacked jurisdiction, then the Court lacked jurisdiction, through no fault of its own. The fraud committed upon the court by the government shows a total disregard for justice  and respect for the court and jury.


Signed,

Phillip Roy Wasserman


## CERTIFICATE OF SERVICE


I certify that a copy of the motion was mailed via first class mail on this date to the U.S. Attorney's Office, 400 N. Tampa Street, Suite 3200, Tanpa, Florida 33602; Attorney General Pam Bondi, Washington, D.C.; and FBI Director Kash Patel, Washington, D.C.


Date:  /0-30-25

Phillip Roy Wasserman

UNITED STATES OF AMERICA, Plaintiff-Appellee, versus IVAN ANDRE SCOTT,
Defendant-Appellant.
UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
61 F.4th 855; 2023 U.S. App. LEXIS 1495; 29 Fla. L. Weekly Fed. C 2151
No. 21-11467
January 20, 2023, Filed

**Editorial Information: Prior History**

{2023 U.S. App. LEXIS 1}Appeal from the United States District Court for the Middle District of Florida. D.C. Docket No. 6:19-cr-00209-PGB-LRH-1.

**Disposition:**
 AFFIRMED.

**Counsel**          For UNITED STATES OF AMERICA, Plaintiff - Appellee: David M. Lieberman, Jeremy Raymond Sanders, U.S. Department of Justice, WASHINGTON, DC; U.S. Attorney Service - Middle District of Florida, U.S. Attorney, U.S. Attorney's Office, TAMPA, FL.

          For IVAN ANDRE SCOTT, Defendant - Appellant: Claudia T. Pastorius, Claudia Pastorius PA, MELBOURNE, FL.

**Judges:** Before JORDAN, ROSENBAUM, and NEWSOM, Circuit Judges.

**CASE SUMMARY**There was sufficient evidence to find that defendant willfully intended to defraud Medicare because evidence showed that defendant purchased a list of Medicare beneficiaries, contacted them by phone, and persuaded them-regardless of whether they had cancer or had a familial history of cancer- to submit genetic cancer-screening testing kits.

**OVERVIEW:** HOLDINGS: [1]-There was sufficient evidence for the jury to find that defendant willfully intended to defraud Medicare because evidence at trial showed that defendant purchased a list of Medicare beneficiaries, contacted them by phone, and persuaded (i.e., recruited) them-regardless of whether they had cancer, had been treated for cancer, or had a familial history of cancer- to submit the genetic cancer-screening testing kits sent to them.

**OUTCOME:** Judgment affirmed.

**LexisNexis Headnotes**

An appellate court normally reviews de novo the legal question of whether an indictment sufficiently alleges a statutorily proscribed offense.

Generally speaking, a claim that the indictment failed to state an offense must be asserted in a pre-trial motion. Fed. R. Crim. P. 12(b)(3)(B)(v).

*Criminal Law & Procedure > Jurisdiction & Venue > Jurisdiction*

A05_11CS                                        1

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



A district court lacks subject matter jurisdiction if the indictment failed to charge conduct that amounts to an offense against the laws of the United States. And a motion that the district court lacks jurisdiction may be made at any time while the case is pending. Fed. R. Crim. P. 12(b)(2).

***Criminal Law & Procedure > Appeals > Standards of Review > De Novo Review > Jurisdiction***

Whether the district court had subject matter jurisdiction in a criminal case is a question of law that an appellate court reviews de novo even when raised for the first time on appeal.

***Public Health & Welfare Law > Social Security > Medicaid > State Plans > Mandatory Services***

Subject to certain exceptions, Medicare covers diagnostic tests or services that are reasonable and necessary for the diagnosis of illness or injury. 42 U.S.C.S. § 1395y(a)(1)(A). Through a regulation, Medicare excludes from coverage routine physical checkups such as examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury, except for screening mammography, colorectal cancer screening tests, screening pelvic exams, screening electrocardiograms, and initial preventive physical examinations and additional preventive services that meet certain statutory criteria. 42 C.F.R. § 411.15(a)(1).

***Public Health & Welfare Law > Social Security > Medicare > Providers > Reimbursement > Reasonable Cost Standard***

Subject to some limited exceptions, Medicare only covers diagnostic laboratory tests and diagnostic tests that are ordered by the physician who is treating the beneficiary. 42 C.F.R. § 410.32(a). That physician must treat a beneficiary for a specific medical problem and use the results of the test in the management of the beneficiary's specific medical problem. 42 C.F.R. § 410.32(a). Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. 42 C.F.R. § 410.32(a).

***Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Legal Issues***

Domestic law is properly considered and determined by the court whose function it is to instruct the jury on the law; domestic law is not to be presented through testimony and argued to the jury as a question of fact.

***Evidence > Procedural Considerations > Weight & Sufficiency***
***Evidence > Procedural Considerations > Burdens of Proof > Proof Beyond Reasonable Doubt***

Appellate review on sufficiency is plenary, and courts consider the evidence introduced at trial in the light most favorable to the verdict. The question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

***Criminal Law & Procedure > Criminal Offenses > Fraud > Insurance Fraud > Elements***
***Criminal Law & Procedure > Criminal Offenses > Fraud > Fraud Against the Government > False Claims > Elements***
***Public Health & Welfare Law > Welfare Fraud***

The elements of healthcare fraud, 18 U.S.C.S. § 1347, are (1) that the defendant knowingly and willfully executed a scheme or artifice (a) to defraud a health care benefit program as defined in 18 U.S.C.S. § 24(b) or (b) to obtain money or property owned by or under the custody and control of a health care benefit program by means of false or fraudulent pretenses, representations, or promises; (2) that the health care benefit program affected interstate commerce; (3) that the false pretenses, representations,

A05_11CS                                         2

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



or promises related to a material fact; (4) that the defendant acted willfully and with intent to defraud; and (5) that the defendant acted in connection with the delivery of or payment for healthcare benefits, items or services. The elements of a healthcare fraud conspiracy, see 18 U.S.C.S. § 1349, are the existence of an agreement to commit health care fraud in violation of § 1347, the defendant's knowledge of that agreement, and the defendant's knowing and voluntary joinder in that agreement.

**Opinion**

**Opinion by:**          JORDAN

**Opinion**

JORDAN, Circuit Judge:

After a five-day trial, a jury convicted Ivan Andre Scott of healthcare fraud in violation of 18 U.S.C. § 1347, conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349, paying kickbacks in connection with a federal healthcare program in violation of 42 U.S.C. § 1320a-7b(b)(1)(A), and conspiracy to pay and receive healthcare kickbacks in violation of 18 U.S.C. § 371. The district court sentenced him to 120 months in prison.

The charges arose out of Mr. Scott's involvement in the submission of claims to Medicare for genetic cancer-screening (CGx) tests for beneficiaries who did not have cancer or a familial history of cancer and that were not ordered by the beneficiaries' primary care physicians. The{**2023 U.S. App. LEXIS 2**} government asserted that such tests-which do not diagnose cancer but only assess the risks of developing the disease-were not covered by Medicare, and that Mr. Scott knew as much but nevertheless engaged in a fraudulent scheme to submit claims for the tests to Medicare.

On appeal, Mr. Scott challenges his healthcare fraud convictions- but not his kickback convictions-on a number of grounds. First, he contends that the indictment failed to state the charged healthcare fraud offenses. Second, he argues that the evidence at trial was insufficient to prove his guilt on those offenses.1

Following oral argument and a review of the record, we affirm.

**I**

Mr. Scott argues that because Medicare covers CGx tests, he did not commit any crimes. *See* Appellant's Br. at 27-35. At times, he seems to couch the argument in  sufficiency terms, but he did not present any evidence or arguments on the coverage issue at trial. Nor did he request that the jury be instructed that Medicare generally pays for CGx tests. The jury therefore could not have concluded that Medicare covered the CGx tests in question.

In an abundance of caution, we construe this particular argument by Mr. Scott as a belated challenge to the{**2023 U.S. App. LEXIS 3**} indictment, rather than as claim of insufficient evidence on the healthcare fraud charges. We do so in part because, as the district court observed, *see* D.E. 136 at 2, that is the precise argument Mr. Scott made in his post-trial motion. *See* D.E. 122 at 11 ("The indictment overlooks the federal statutory coverage for USPSTF-recommended screening tests as personalized prevention plan services under the Affordable Care Act[,] 42 U.S.C. § 1395x(ddd)(3).").

We normally "review *de novo* the legal question of whether an indictment sufficiently alleges a

A05_11CS                                            3

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



statutorily proscribed offense." *United States v. Seher*, 562 F.3d 1344, 1356 (11th Cir. 2009). But that plenary standard may not govern here.

Generally speaking, a claim that the indictment "fail[ed] to state an offense" must be asserted in a pre-trial motion. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). Mr. Scott never challenged the sufficiency of the indictment before or during trial, and only attacked the indictment in a post-judgment motion for judgment of acquittal. One would think that this would be a problem for him, but our precedent allows a defendant to assert for the first time on appeal- under the plain error doctrine-that the indictment against him failed to charge federal offenses. *See, e.g., United States v. Meacham*, 626 F.2d 503, 509 (5th Cir. 1980) ("With respect to the failure to raise the issue in the**{2023 U.S. App. LEXIS 4}** district court, we hold that the right to be free of prosecution under an indictment that fails to charge an offense is a substantial right. Therefore, even though neither Meacham nor Gilroy brought the defect in the indictment to the district court's attention, we may notice the defect on appeal. Fed. R. Crim. P. 52(b)[.]"). *See also* 6 Orfield's Criminal Procedure Under the Federal Rules § 52.8 (June 2022 update) ("Where an indictment fails to state an offense, it is plain error and reversible even though not objected to.") (footnote omitted).

On the other hand, we have said that a district court "lack[s] subject matter jurisdiction if the indictment failed to charge conduct that amounts to an offense against the laws of the United States[.]" *United States v. Morales*, 987 F.3d 966, 978 (11th Cir. 2021). And a "motion that the district court lacks jurisdiction may be made at any time while the case is pending." Fed. R. Crim. P. 12(b)(2).2

Given that "[w]hether the district court had subject matter jurisdiction [in a criminal case] is a question of law that we review *de novo* even when raised for the first time on appeal," *United States v. Grimon*, 923 F.3d 1302, 1305 (11th Cir. 2019) (internal quotation marks and citation omitted), our standard of review is unclear. But we need not decide whether to apply *de novo* or plain error review here. Even if our review is plenary, Mr. Scott's challenge to the indictment**{2023 U.S. App. LEXIS 5}** fails.

**A**

Medicare is a federally-funded health insurance program which provides "medically necessary" services for people who are over the age of 65 or have disabilities. *See* D.E. 1 at 1 ¶ 1; *Fischer v. United States*, 529 U.S. 667, 671, 120 S. Ct. 1780, 146 L. Ed. 2d 707 (2000). Subject to certain exceptions, Medicare covers diagnostic tests or services that are "reasonable and necessary for the diagnosis of illness or injury[.]" 42 U.S.C. § 1395y(a)(1)(A). Through a regulation, Medicare excludes from coverage "[r]outine physical checkups such as[ ] . . . [e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury, except for screening mammography, colorectal cancer screening tests, screening pelvic exams, . . . screening electrocardiogram[s]," and "initial preventive physical examinations" and "additional preventive services" that meet certain statutory criteria. *See* 42 C.F.R. § 411.15(a)(1). CGx tests are not listed as covered services in the regulation. *See id.*

Diagnostic tests are also subject to other Medicare requirements. Subject to some limited exceptions not relevant here (e.g., certain diagnostic mammograms), Medicare only covers "diagnostic laboratory tests" and "diagnostic tests" that are "ordered by the physician who is treating the beneficiary[.]"**{2023 U.S. App. LEXIS 6}** 42 C.F.R. § 410.32(a). That physician must "treat[ ] a beneficiary for a specific medical problem and . . . use[ ] the results [of the test] in the management of the beneficiary's specific medical problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

A05_11CS                                          4

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**B**

According to the indictment, CGx testing uses DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain kinds of cancer in the future. *See* D.E. 1 at 5 ¶ 11. The test results do not indicate whether the patient has cancer and instead measure the patient's risk of developing the disease. *See id.*

Citing to 42 U.S.C. § 1395y(a)(1)(A), the indictment alleged that Medicare did not cover diagnostic testing that was not reasonable or necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* D.E. 1 at 5 ¶ 12. Except for certain statutory exceptions-such as screening mammography, colorectal cancer screening, screening pelvic exams, and prostate screening tests-Medicare did not cover examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury. *See id.* (quoting{**2023 U.S. App. LEXIS 7**} 42 C.F.R. § 411.15(a)(1)).

The indictment also alleged that, if testing was necessary for diagnosis or treatment, Medicare required that it be ordered by the physician who is treating the beneficiary, i.e., the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the patient's specific medical problem. *See id.* at 5-6 ¶ 13 (quoting 42 C.F.R. § 410.32(a)). In the words of the indictment, tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. *See id.* at 6 ¶ 13.

Turning back to CGx testing, the indictment alleged that it did not diagnose cancer and only assessed the risks of developing the disease. As a result, Medicare covered such testing only in limited circumstances, "such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer." *Id.* at 6 ¶ 14. Medicare, claimed the indictment, "did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer." *Id.*

With respect to the healthcare fraud charges under 18 U.S.C. §§ 1347 & 1349, the indictment asserted that Mr. Scott conspired with others to submit{**2023 U.S. App. LEXIS 8**} claims to Medicare for CGx tests that were not medically necessary and that he submitted or caused to be submitted a number of claims to Medicare for CGx tests that were not medically necessary. *See* D.E. 1 at 7-14. For the three substantive healthcare fraud charges, the claims submitted to Medicare for CGx tests were for $12,601.24, $12,601.24, and $22,724.26. *See id.* at 14.

**C**

Mr. Scott argues that the indictment failed to charge federal healthcare fraud offenses. He asserts that CGx testing is considered Grade A/B preventive testing by the U.S. Preventive Services Task Force and is therefore covered by Medicare. *See, e.g.*, Appellant's Br. at 35 ("The USPSTF Grade A and B tests must be covered by Medicare."). We disagree and conclude that the indictment was sufficient.

The USPSTF, an independent, volunteer panel of national experts, makes evidence-based recommendations about clinical preventive tests, including screening tests. *See generally* Govind Persad, *Evaluating the Legality of Age-Based Criteria in Health Care: From Nondiscrimination and Discretion to Distributive Justice*, 60 B.C.L. Rev. 889, 944 (2019). In his brief, Mr. Scott cites to a website in which the USPSTF recommends CGx testing as follows:

> Primary care clinicians assess women with a personal or family history of breast, ovarian, tubal, or peritoneal cancer or who have an ancestry associated{**2023 U.S. App. LEXIS 9**} with breast cancer susceptibility 1 and 2 (BRCA1/2) gene mutations with an appropriate brief familial risk

A05_11CS                                                5

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



assessment tool. Women with a positive result on the risk assessment tool should receive genetic counseling and, if indicated after counseling, genetic testing.Appellant's Br. at 34-35 (citing USPSTF.org, Grade A & B Tests, https://www.uspreventiveservicestaskforce.org/uspstf/recommendation-topics/uspstf-a-and-b-rec ommendations).

Mr. Scott submits that CGx testing is not diagnostic in nature and that, as a result, the federal statutes and regulations governing diagnostic testing that are referenced in the indictment (e.g., 42 U.S.C. § 1395y(a)(1)(A), 42 C.F.R. § 410.32(a), 42 C.F.R. § 411.15(a)(1)) do not control or limit Medicare coverage. *See* Appellant's Br. at 30-32. Assuming without deciding that Mr. Scott is right that CGx testing is not diagnostic, he has failed to show that the indictment failed to charge healthcare fraud offenses. He has, in other words, not demonstrated that under federal law the CGx testing referenced in the indictment is covered by Medicare.

A provision of the Affordable Care Act of 2010 requires that Grade A/B preventive services recommended by the USPSTF be covered by certain "group health plan[s]" and "health insurance issuer[ s]." *See* 42 U.S.C. § 300gg-13(a)(1); *Little Sisters of the Poor Sts. Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380, 207 L. Ed. 2d 819 (2020). But**{2023 U.S. App. LEXIS 10}** Medicare is neither a group health plan nor a health insurance issuer under the ACA. *See* 42 U.S.C. § 300gg-91(a)(1) ("The term 'group health plan' means an employee welfare benefit plan (as defined in [§ 3(1) of ERISA]) to the extent that the plan provides medical care . . . to employees or their dependents[.]"); § 300gg-91(b)(2) ("The term 'health insurance issuer' means an insurance company, insurance service, or insurance organization (including a health maintenance organization . . . ) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance . . . Such term does not include a group health plan."). The ACA, therefore, does not mandate Medicare coverage for CGx testing of beneficiaries.

Mr. Scott has not pointed to any federal statutes or regulations which require that Medicare pay for Grade A/B preventive screening tests (like CGx tests) which are recommended by the USPSTF. The provisions he cites to simply do not dictate such Medicare coverage. *See, e.g.*, 42 U.S.C. § 1302(b) (addressing certain procedural requirements for rulemaking); 42 U.S.C. § 18022(b)(1)(I) (providing that the essential health benefits in certain health plans shall include "[p]reventive and wellness services and chronic disease management");**{2023 U.S. App. LEXIS 11}** *Libby v. Price*, 689 F. App'x 659, 660 (2d Cir. 2017) (explaining that "the ACA's provisions regarding . . . essential health benefits do not apply to Medicare recipients") (citing 42 U.S.C. §§ 300gg-6 & 300gg-91(b)(2)).

As explained in *United States v. Patel*, Case No. 19-CR-80181-RAR, 2021 U.S. Dist. LEXIS 115925, 2021 WL 2550477, at *5 (S.D. Fla. June 22, 2021)-a case also involving federal healthcare fraud charges relating to claims for CGx tests-§ 4104 of the ACA amended 42 U.S.C. § 1395x(ddd) by defining screening and other preventive services covered by Medicare to mean the services listed in 42 U.S.C. § 1395x(ww). *See* Pub. L. 111-148, § 4104, 124 Stat. 119 (2010). The problem for Mr. Scott is that the services listed in § 1395x(ww) do not include CGx testing. *See Patel*, 2021 U.S. Dist. LEXIS 115925, 2021 WL 2550477, at *5.

Mr. Scott refers us to 42 U.S.C. § 1395x(hhh)(2)(E) and 42 U.S.C. § 1395*l*(a)(1)(X), but those two provisions also do not mandate Medicare coverage for CGx testing. The former states that the term "personalized prevention plan services" means the creation of a plan that "may" contain a "screening schedule for the next 5 to 10 years, as appropriate, based on recommendations of the [USPSTF] and the Advisory Committee on Immunization Practices, and the individual's health status, screening history, and age-appropriate preventive services." § 1395x(hhh)(2)(E). And the latter provides a fee schedule to determine how Medicare pays for covered services, but "it does not expand the scope of

A05_11CS                                                     6

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

services that Medicare covers." *Patel*, 2021 U.S. Dist. LEXIS 115925, 2021 WL 2550477, at *5. *See* § 1395*l*(a)(1) (indicating that the fee schedule that follows applies only to "services with respect to which{**2023 U.S. App. LEXIS 12**} benefits are payable under this part . . . "). In sum, neither of these statutory provisions require that Medicare cover all Grade A/B tests recommended by the USPSTF.

Given the statutory and regulatory landscape, we agree with the district court that the indictment was sufficient to charge Mr. Scott with healthcare fraud. The indictment charged that CGx tests in question were not for beneficiaries who were being treated for cancer or who had a familial history of cancer and were not ordered by the beneficiaries' treating physicians. *See* D.E. 136 at 7- 10.

**D**

Even if Mr. Scott had shown that Medicare generally covered CGx testing, he would not have been entitled to a dismissal of the indictment. The USPSTF recommendation he relies on calls for "genetic counseling and, if indicated, genetic testing," but only after an assessment by primary care physicians of patients with a personal or family history of certain cancers with "an appropriate brief familial risk assessment tool." The indictment does not indicate that the Medicare beneficiaries who had CGx testing done as part of the scheme had a personal or family history of cancer or that they went through the assessment called for by the{**2023 U.S. App. LEXIS 13**} USPSTF. Because there is "[n]o summary judgment procedure in criminal cases," and because the "sufficiency of a criminal indictment is determined from its face," *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992), the matter of Medicare coverage had to be resolved at trial. *See Patel*, 2021 U.S. Dist. LEXIS 115925, 2021 WL 2550477, at *4 ("[E]ven if the Court were to accept Patel's position that Medicare is required to cover USPSTF-recommended screening tests, the question of whether the CGx tests billed by Patel fell within this USPSTF recommendation- or were otherwise billed in a manner that Medicare covers-is a factual issue that cannot be resolved on a motion to dismiss.").

Mr. Scott did not present or raise the USPSTF's recommendation (and its purported legal force) before or during the trial and did not ask the district court to instruct the jury on the applicability of that recommendation with respect to Medicare coverage for CGx testing. As we have explained, "[d]omestic law is properly considered and determined by the court whose function it is to instruct the jury on the law; domestic law is not to be presented through testimony and argued to the jury as a question of fact." *United States v. Oliveros*, 275 F.3d 1299, 1306-07 (11th Cir. 2001) (affirming exclusion of defense expert who was to testify about what federal immigration law provided at a{**2023 U.S. App. LEXIS 14**} certain time on several issues). "In order to establish that the law" required Medicare coverage for CGx testing recommended by the USPSTF, Mr. Scott "should have presented the matter . . . to the district court and asked the court to instruct the jury on the law. [But] [h]e did not do that." *Id.* at 1307.

Our review of the charge conference indicates that Mr. Scott did not object to the instructions given by the district court on the healthcare fraud claims, and that he did not request an instruction concerning the applicability or legal force of the USPSTF's recommendations. *See* D.E. 118 at 240-57 (charge conference); D.E. 102 at 14-20 (jury instructions). To make matters worse, when he moved for judgment of acquittal under Rule 29 at the close of the government's case, he did not mention or rely on the USPSTF's recommendation. *See* D.E. 118 at 227-28.

**II**

Mr. Scott contends that the government presented insufficient evidence to convict him of healthcare fraud and conspiracy to commit healthcare fraud. Our review on sufficiency is plenary, and we consider the evidence introduced at trial in the light most favorable to the verdict. *See, e.g., United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007). The question is whether "*any* rational trier of

A05_11CS                                              7

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



fact could have{2023 U.S. App. LEXIS 15} found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia* , 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original).

**A**

The elements of healthcare fraud, *see* 18 U.S.C. § 1347, are (1) that the defendant knowingly and willfully executed a scheme or artifice (a) to defraud a health care benefit program as defined in 18 U.S.C. § 24(b) or (b) to obtain money or property owned by or under the custody and control of a health care benefit program by means of false or fraudulent pretenses, representations, or promises; (2) that the health care benefit program affected interstate commerce; (3) that the false pretenses, representations, or promises related to a material fact; (4) that the defendant acted willfully and with intent to defraud; and (5) that the defendant acted in connection with the delivery of or payment for healthcare benefits, items or services. *See United States v. Gonzalez* , 834 F.3d 1206, 1223-24 (11th Cir. 2016); *United States v. Clay*, 832 F.3d 1259, 1311 (11th Cir. 2016); *United States v. Klein* , 543 F.3d 206, 211 (5th Cir. 2008). The elements of a healthcare fraud conspiracy, *see* 18 U.S.C. § 1349, are the existence of an agreement to commit health care fraud in violation of § 1347, the defendant's knowledge of that agreement, and the defendant's knowing and voluntary joinder in that agreement. *See United States v. Ifediba*, 46 F.4th 1225, 1243- 44 (11th Cir. 2022).

Mr. Scott owned and operated Scott Global, LLC, a telemarketing company that marketed CGx tests to Medicare beneficiaries. CGx testing{2023 U.S. App. LEXIS 16} uses DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain kinds of cancer in the future. As noted earlier, the test results do not indicate whether the patient has cancer, and instead measure the patient's risk of developing the disease.

Scott Global's employees purchased Medicare beneficiary lists from a data broker. Telemarketers from Scott Global then called the Medicare beneficiaries and told them that Medicare covered CGx tests. The telemarketers collected the beneficiaries' biographical information and medical history, including the names of their primary care physicians. Scott Global arranged shipment of the CGx testing kits to the beneficiaries, and Mr. Scott paid kickbacks to MedSymphony, a telemedicine company which provided doctors' orders authorizing the CGx tests.

MedSymphony approved 98% of Scott Global's CGx requests. MedSymphony's telemedicine doctors, however, were not the beneficiaries' treating physicians, and never examined the beneficiaries recruited by Scott Global before ordering the tests. Indeed, they did not have a prior relationship with the beneficiaries; they rarely communicated directly with the beneficiaries;{2023 U.S. App. LEXIS 17} they never provided medical treatment to the beneficiaries; and they did not comply with the preliminary testing and counseling prerequisites spelled out in the USPSTF's recommendation. The government therefore presented ample evidence that the CGx tests marketed by Mr. Scott and Scott Global were not medically necessary and therefore ineligible for Medicare reimbursement.

Mr. Scott arranged to send the patient specimens and the doctors' orders to laboratories, which performed the CGx tests and billed Medicare for them. eLab Partners, a broker, served as the middleman for sending the specimens to the laboratories. Beneficiaries returned their completed specimens to a P.O. Box controlled by Scott Global, and eLab collected the specimens from that P.O. Box and sent them along with the doctors' orders to one of three laboratories.

The laboratories performed the CGx tests and posted the results on the MedSymphony portal. When they were paid by Medicare, the laboratories provided a share of their reimbursement proceeds to Mr. Scott and his co-conspirators. Between 2018 and 2019, the laboratories submitted over $3

A05_11CS                                        **8**

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



million in Medicare reimbursement claims for CGx tests. Medicare paid anywhere{2023 U.S. App. LEXIS 18} from $1,500 to thousands of dollars for a typical genetic cancer-screening test.

For example, a telemedicine doctor in Florida ordered a CGx test for Carlos Bell, a Medicare recipient from Maryland who was recruited into the scheme by Mr. Scott. The form used to order the testing had multiple inconsistencies. It stated that "no personal history [of cancer] was reported," and the space on the form where any symptoms of cancer should be listed was blank. Yet the doctor from MedSymphony wrote that Mr. Bell was "concerned about cancer based on his history of cancer" and recommended CGx testing "[b]ased on presentation of family history of cancer and documented symptoms." The doctor never examined Mr. Bell, who was living in another state at the time of the consultation, and did not discuss the results of the test with him. One of the laboratories billed Medicare $12,601.24 for Mr. Bell's test.

**B**

Mr. Scott challenges only one of the elements for the healthcare fraud charges-he asserts that there was insufficient evidence for the jury to find that he willfully intended to defraud Medicare. Keeping in mind that intent can be proven through circumstantial evidence, *see, e.g., United States v. Suba*, 132 F.3d 662, 675 (11th Cir. 1998), we uphold the{2023 U.S. App. LEXIS 19} jury's verdict.

The evidence at trial showed that Mr. Scott purchased a list of Medicare beneficiaries, contacted them by phone, and persuaded (i.e., recruited) them-regardless of whether they had cancer, had been treated for cancer, or had a familial history of cancer- to submit the CGx testing kits sent to them. During the telemarking calls, and with scripts supplied by eLab, Scott Global collected information on the beneficiaries' primary-care physicians. But rather than contact those physicians, Mr. Scott and Scott Global arranged (through MedSymphony) for telemedicine doctors to order the CGx tests.

Not surprisingly, the telemedicine doctors did not examine the beneficiaries before approving and ordering the CGx tests, and did not consult with them when the test results were received. As the government correctly says, the jury "could reasonably view this sequence-first soliciting random Medicare beneficiaries to take an expensive medical test and later seeking a telemedicine doctor's order justifying it-as evidence of [Mr.] Scott's intent to procure illegitimate doctor[s'] orders." Appellee's Br. at 29.

As noted, the government presented evidence that the CGx tests in question were{2023 U.S. App. LEXIS 20} not medically necessary and therefore not covered by Medicare. MedSymphony's doctors nevertheless approved around 98% of the CGx tests, and the jury could additionally view this figure as evidence that Mr. Scott knew that the doctors' orders for the tests were not medically necessary or legitimate. Indeed, eLab informed Mr. Scott that profits for Scott Global were based on the "number of tests accepted and processed successfully by the lab[oratories.]"

Mr. Scott, moreover, paid kickbacks to MedSymphony for its participation in the scheme. On this record, a jury could reasonably infer that Mr. Scott knew the orders he procured from MedSymphony were illegitimate because the telemedicine doctors had no relationship with or treatment responsibility for the beneficiaries and because the beneficiaries did not have cancer or a familial history of cancer. For example, Mr. Scott admitted in phone calls that paying kickbacks to MedSymphony for the telemedicine doctors to sign orders approving the CGx tests was improper. *See* Gov't Ex. 303:6 ("The teledoctors are not supposed to be taking . . . a payment."); Gov't Ex. 305:11 ("[I]t's against the law to pay the doctors. The doctors are not supposed{2023 U.S. App. LEXIS 21} to accept any money."). Although Mr. Scott argues that his statements are only relevant to the kickback charges, the law is to the contrary. *See, e.g., United States v. Grow*, 977 F.3d 1310,

A05_11CS                                        9

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



1325 (11th Cir. 2020) ("[T]ogether with other evidence, we've treated paying kickbacks as evidence of healthcare fraud."); *United States v. Hughes*, 895 F.2d 1135, 1142 (6th Cir. 1990) (explaining that the jury could infer that the defendant paid kickbacks to order testing that was not medically necessary).

Finally, Mr. Scott submits that he merely had a different interpretation of Medicare's legal requirements for coverage of CGx tests. He did not, however, testify as to his understanding of Medicare coverage. Nor did he put before the jury any evidence concerning the USPSTF's recommendation or his reliance on that recommendation. In any event, Mr. Scott's evidentiary contentions are in essence jury arguments and do not negate the substantial evidence of intent presented at trial. The government did not need to present evidence "exclud[ing] every reasonable hypothesis of innocence or [that was] wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Mateos*, 623 F.3d 1350, 1361 (11th Cir. 2010).

III

We affirm Mr. Scott's convictions and{**2023 U.S. App. LEXIS 22**} sentence.

**AFFIRMED.**

## Footnotes

1

Mr. Scott also seeks to set aside his sentence, asserting that the district court erred by imposing a leadership enhancement and in calculating the loss amount. On those issues, we perceive no clear error and summarily affirm.

2

We acknowledge that, as the Supreme Court has held, not all defects in an indictment deprive a district court of jurisdiction. *See United States v. Cotton*, 535 U.S. 625, 629-32, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002) (indictment's omission of drug quantity, which increased the maximum statutory penalty, was not jurisdictional). Our decisions, however, have "refused to find that *Cotton* altered our established precedent recognizing that the failure to allege a crime in violation of the laws of the United States is a jurisdictional defect." *United States v. Izurieta* , 710 F.3d 1176, 1179 (11th Cir. 2013) (citing post-*Cotton* Eleventh Circuit cases).

A05_11CS                                        10

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Phillip ROY WASSerman
#73653-018 UNIT B-2
FCC-COLEMAN LOW
PO BOX 1031
Coleman, FL
        33521

Screened by USMS

TAMPA FL 335
SAINT PETERSBURG FL
1 NOV 2025 PM 3

Clerk OF THE
COURT
US DISTRICT COURT
801 N. FLORIDA AVE
Tampa, FL
        33602

33602-380099

