In the Middle District of Florida
Tampa Division

United States of America

v.

Phillip Roy Wasserman
Case number 8:20-CR-207-CEH

Motion to Allow Discovery in Support of Defendant's Pending Second Rule 33 Motion

Defendant requests that he be allowed to take discovery in support of his second pending Rule 33 motion and alleges he has good cause. Binding Eleventh Circuit law states that discovery is allowed upon a showing of "good cause" meaning a factual showing that evidence would case doubt on guilt. Arthur V. Allen, 452 F.3d 1234 (11th Cir. 2006). Arthur also cited Schulp v Delo to say evidence must "raise sufficient doubt" about guilt. Defendant also cites to this court Harris v. Nelson, 394 U.S. 286 (1969) and Bracy v. Gramley, 520 U.S. 899(1997).

Defendant is in federal custody based on a wrongful conviction for conspiracy and fraud, the result of cumulative instances of government misconduct. He only learned through newly discovered evidence that the FBI, after being pushed by state agent Howland, took over the investigation with state agents but ultimately declined to pursue the case. Defendant asserts that the government concealment of the Task Force (See exhibits 1-3) and FBI involvement and their rationale for dropping the case (exculpatory evidence) violates due process (Brady/Napue) contradict Howland and Batsch's trial testimony at defendant's trial (Giglio/Napue/Glossip v. Oklahoma) and denied defendant the right to a fair trial. He now seeks discovery to develop these claims, withheld from him, the Court and the jury. Ties in with the Rossman suppressed evidence this is cumulative suppressed evidence under Kyles and Bagley.

Good Cause for discovery exists. As the Eleventh circuit held in Arthur, discovery requires "specific allegations: that suggest evidence would undermine confidence in the trial outcome. Here the allegations are concrete: the FBI, not disclosed to the defense or the jury, determined "no Case" after investigation, yet then the IRS, (without jurisdiction) pursued fraud charges. These come from the sworn testimony of former OFR agent Howland(see exhibits 1-2) and internal government records recently revealed. These are precisely the type of allegations that establish "good cayuse". Indeed , like Bracey, defendant has proffered credible evidence of "official misconduct that so fatally infected the proceedings" that an inquiry is necessary.

Furthermore, defendant alleges the government intentionally misrepresented the origins of the case at trial due to uncorrected false testimony of Howland and Batsch, who testified as if the case was state /IRS driven. Howland now admits the FBI's true key role. If true, the prosecutions' presentation was incomplete and misleading., a classic Napue claim. Discovery is now needed to examine whether the FBI had exculpatory information(the basis for declining) and whether prosecutors knew of this and failed to disclose it(Brady/Giglio). The requested discovery-(see attachment 1) is narrowly tailored to those issues. Under Harris, when "specific allegations before the court show reason to believe that the defendant may demonstrate he is confined illegally" the courts must allow inquiry. defendant's allegations meet that standard.

Discovery will clarify the Brady/Napue issues. if the FBI truly investigated and dismissed the case, that strongly suggests exculpatory evidence existed(and was not disclosed). for instance, FBI agents create extensive reports(FD-302s) and may have found records negating criminal intent. The deposition of agents Stone and Volp or review of FBI files could uncover evidence in the government's exclusive possession. Under Brady, the suppression of any such material is per se prejudicial if it could have affected the outcome. here without discovery, the court has only one side's (prosecutor's) version of events. Granting discovery serves "the duty of the court to provide the necessary facilities for an adequate inquiry" into the truth.

Narrow tailoring. The defendant's requests are focused-they cover only evidence about the Task force and FBI participation and any non disclosure.

**Specific Allegations ** The motion and attached documents allege detailed facts: an FBI led t Task Force investigated defendant, declined to proceed, and that information was "never disclosed" to the defense. These are not vague. the allegations are supported by Howland's sworn testimony and government filings in the civil case(See exhibits 1-3).They relate directly to the Brady material(why FBI dropped the case) and Napue false and misleading uncorrected testimony of Batsch and Howland. Fully developed, these facts could prove that investigators and the prosecution suppressed exculpatory evidence. For example, if the FBI concluded "no case" and withheld that, a jury might doubt the fraud narrative. Under Schlup/Bracey , such doubt about guilt is **sufficient ** to justify discovery.

** Diligence and Narrow Scope** Defendant could not have discovered these facts earlier through reasonable diligence. The

FBI files and Task Force information only became known after the government's contradictory civil litigation filings and agent testimony. Defendant has actively and had actively pursued these leads(pre-trial motions, civil suit, appeals). Diligence has been met. The request is tightly limited to facts about the FBI/Task Force involvement. It is not a fishing expedition into unrelated claims. Each interrogatory and request is directed to the core constitutional issue.

Conclusion.

Defendant sets forth both detailed legal and factual argument. "good cause is demonstrated where specific allegations show reason to believe that the defendant may, if the facts are fully developed, be able to demonstrate that he is entitled to relief."Bracey, 520 U.S. at 908,09(quoting Harris).

The standard is met here, and the balance of equities favors providing the court with the full factual record. The requested discovery is narrowly tailored to avoid undue burden . The Government will not be prejudiced by producing documents it should have disclosed long ago: rather, the discovery merely levels the playing field. For all these reasons defendant respectfully requests that the Court grant this motion and order the proposed discovery procedures.

Respectfully Submitted on June 11, 2026

Phillip Roy Wasserman

Certificate of Service

I certify a copy of the motion was mailed to the United States Attorney, 400 N. Tampa, Suite 3200, Tampa, Florida 33602 on June 11,2026.

Phillip Roy Wasserman

2

Attachment 1

Proposed Discovery

** Proposed Discovery** Petitioner seeks the following, all narrowly focused:
1-Parties petitioner is seeking discovery from:
a-Former IRS agent Batsch
b-Former Florida Office of Financial Regulation (OFR) agent Howland
c-OFR manager Gabriel Acosta
d-Former FBI agent Stone
e-FBI agent Rick Volp
f-Former AUSA Bedke
g-AUSA Jones
h-any other as to date unidentified member of the Task Force or FBI with knowledge of Petitioner's case.

2-** Depositions** Notice deposition of all above parties:
a-Stone-May have unique knowledge of the FBI's role and any documents
b-Volp-Same as above
c-Batsch-To examine his knowledge of Task Force proceedings and any withheld evidenced-Howland-same as above
d- Bedke and Jones- To determine what roles they played in withholding exculpatory evidence and potential Napue violations
e-Acosta- Howland's  manager-to determine his knowledge of the Task Force and OFR participation and withheld evidence
f-if further necessary, depositions of custodians of records at the FBI/DOJ who can authenticate or explain relevant documents.

Deposition notices will specify relevant dates and allow reasonable time. Each will be limited in scope to task force and FBI activities and disclosure issues.

3- **Document Requests **Requests for production of documents on the responsible government parties(U. S. Attorney's Office, FBI, IRS):
- All records between the FBI Financial Crimes Task force (Including the FBI, IRS and OFR) concerning Petitioner's case (meeting minutes, emails, memoranda, etc.,).
-All FBI 302 reports or interview notes reguarding interviews of any witnesses in Petitioner's case
-Any internal FBI/IRS/OFR reports concerning the decision to decline task force and FBI investigation.
-Any evidence withheld from petitioner
-Investigative files of Howland, Batsch, Volp and Stone relating to this case.

Each document request is limited to materials directly related to Petitioner's case and the FBI and Task Force's investigation.

4- **Interrogatories **-See attached list for proposed interrogatories.

5- **Requests For Admissions** See attached list of proposed request for admissions.

**Proposed Interrogatories**

1-Identify all members of the Task Force and their law enforcement affiliation.

2-Whether minutes of meetings of the Task Force were taken.

3-Whether the FBI had a *Financial Crimes Task Force* meeting or meetings where petitioner was discussed , who attended and what was discussed.

4-Whether FBI agents Stone and Volp participated in any interviews or investigations of witnesses, and to describe those contacts.

5-Whether the FBI and it's agents ever had discussions with OFR manager Acosta , former OFR agent Howland, or former AUSA Bedke or AUSA Jones, or IRS agent Batsch or any other IRS employee and when those discussions took place and what was discussed.

6-Whether the FBI formally declined or closed the Petitioner's case (as suggested by Stephen Howland ), and why.

7-Whether any reports, notes , or memoranda were prepared by the FBI or any other Task Force member not affiliated with the IRS or OFR concerning Petitioner.

8-Whether the FBI or Task Force possessed any information favorable to petitioner (e.g.. evidence undermining prosecution theory) that was not given to the defense.

**Proposed Requests for Admissions**

1-Admit that Stephen Howland's testimony as attached in exabits 1 and 2 is accurate in that the FBI was involved and declined the case.

2-Admit that the any records reflecting Task Force or FBI involvement are in the custody of the Government.

3-Admit that the FBI never disclosed to Petitioner that it declined his case.

4-Admit that no discovery (as noted in Howland's attached deposition testimony ) was ever disclosed to the Petitioner.

5- Admit that Batsch's trial testimony about the origins of the case against Petitioner makes no reference to the Task Force or FBI.

6-Admit that Howland's trial testimony about the origins of the case against Petitioner makes no reference to the to the Task Force or FBI.

&-Admit that the Government was served with a Court Order outlining the Due Process Protections Act and it's obligations under such in petitioner's case.

9-Admit that the Government violated that Court order by not disclosing the FBI or Task Force involvement in Petitioner's case.

Exhibit 1

Case 8:20-cr-00207-CEH-NHA    Document 1227    Filed 06/15/26    Page 7 of 16 PageID
Case 6:25-cv-02498-AGM-RMN    Document 10-2    Filed 03/20/26    Page 38 of 44 PageID
210

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

----------------------------------------------------------------------------------------

FROM: Kent, Robert
TO: 73653018
SUBJECT: Depo Testimony of Howland re FBI
DATE: 10/08/2025 11:51:03 AM

I hope this is what you are requesting.  This may take multiple messages.
page 67

MR. KENT: Does everybody agree we can attach this as an exhibit?

MR. SCHULTZ: No objection.

MR. WEISBERG: No objection.

MR. KENT: So I don't need to spend more time with it right now as long as we have it as an exhibit. As I said, I'm going to mark it as Number 12, so that the numberings that I have on any other exhibits don't have to be changed. Unless anybody else wants to keep it up there for a moment, you can take it down, Andrew. Thank you for that.

Q. Mr. Howland, getting back to this round table, you were there, you said Mr. Batsch was there; how many total people were at this round table?

A. I mean, it was just a loose meeting we had on a different case, and probably like three, total. Not including myself, so four total.

Q. Some of the people there were FBI agents?

A. Correct.

Q. And then the general purpose of this meeting to start with pertained to your other case?

A. Correct.

Q. And you were the one who brought up the FastLife Wasserman situation?

A. Correct.

Q. Do you remember the names of the FBI agents who were there?

A. I believe it was Jay Stone and Rick Volp.

Q. What was the last name?

A. Volp, V-o-l-p.

Q. Do you remember the first name?

A. Rick.

Q. And other than the prior unidentified case, have you worked with these FBI agents on other matters?

A. Are you excluding that unidentified case? No, that was the only time I ever worked with them I think.

Q. Now, did you disclose this round table meeting to Mr. Wasserman at any point including during the trial?

A. No.

Q. Do you have any reason to believe Mr. Wasserman had knowledge of this round table meaning before today?

A. I don't know. It was just a loose -- it was a gathering.

Q. Yes or no, really.

A. Okay. Repeat the question.

Case 8:20-cr-00207-CEH-NHA    Document 1227    Filed 06/15/26    Page 8 of 16 PageID
38,192
Case 6:25-cv-02498-AGM-RMN    Document 10-2    Filed 03/20/26    Page 39 of 44 PageID
211

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

Q. Do you have any reason to believe Mr. Wasserman had knowledge of this round table meeting prior to him hearing about it today?

A. No, I don't think he needed to have knowledge.

Q. Sir, just --

A. I need to explain my answer.

Q. If I ask you a question that asks for an explanation.

A. I don't think that's how it works.

Q. Actually, it does.

MR. SCHULTZ: Mr. Howland, if you feel you need to explain, I'll have a turn to ask you some questions and we can get into it then. Please just answer Bob's questions to the best of your ability at this point, okay?

THE WITNESS: Yeah.

MR. SCHULTZ: Thank you.

Q. So your answer was, you don't believe he knew about this meeting before today?

A. No, it wasn't a meeting about Mr. Wasserman.

Q. Well, it became a meeting about him, didn't it?

A. No, it did not, it became a discussion of

Page 69

all cases that all the agents had, and seeing who, you know, different ideas and stuff like that. It's --

Q. Right, but even though he was not the purpose of the meeting when it was arranged, he was discussed, you said that already?

A. Yeah, it was just a loose meeting, a loose talking.

Q. I'm not concerned if it was loose or not loose, his name and FastLife's name were part of the round table?

A. Correct. Yeah, it wasn't about him, but, yes, correct.

Q. Well, it was, you brought his name up?

A. The purpose of the meeting was not about him.

Q. I'm not asking the purpose.

A. It was discussed, yes.

Q. How long is your best estimate of the discussion pertaining to Mr. Wasserman and FastLife?

A. Less than five minutes.

Q. And what did you say about the status of your involvement? Let me correct it. At the time of the round table meeting, your investigation of the FastLife Wasserman

situation had been going on four to six months, correct?

A. Yeah, I guess, a guesstimate, yes.

Q. You started in July, 2018 and you said this round table meeting was late 2018, correct?

A. Correct, yep.

Case 8:20-cr-00207-CEH-NHA    Document 1227    Filed 06/15/26    Page 9 of 16 PageID
Case 6:25-cv-02498-AGM-RMN    Document 10-2    Filed 03/20/26    Page 40 of 44 PageID
212

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

Q. So as of the time of the round table meeting, have you interviewed any witnesses?

A. I believe so, yes.

Q. Do you know how many witnesses you interviewed?

A. Probably four, maybe; three to four, four.

Q. I know it's -- I guess about six years ago now; do you know the names of the witnesses you had interviewed as of the date of the round table meeting?

A. At the end of 2024 and 2018, I had interviewed Jerry Houchens, Joyce Knapp, Rick Figlio, and I think Ron Cassanova, if I'm not mistaken.

Q. Okay. So you're saying that -- well, let me ask you this. How long was the entire round table meeting?

A. I mean, I don't remember exactly. It was on a different case.

Q. I understand it probably initiated on

Page 71

Exhibit 2

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

FROM: Kent, Robert
TO: 73653018
SUBJECT: Howland Depo (Part 2)
DATE: 10/08/2025 11:51:03 AM

another case, but just your best estimate, was it one hour, two hours?

A. Probably like a half a day.

Q. And was this in person somewhere?

A. Yeah, we had multiple in person meetings in Sarasota at the FBI's office in Sarasota.

Q. Where was this meeting?

A. At the FBI office, I believe. We had meetings for that case specifically in the beginning of it, yes.

Q. In Sarasota?

A. Yes.

Q.. Were Agent Stone based in the Sarasota office?

A. Yes.

Q. All right. Now, maybe I misinterpreted your testimony, but in addition to the unidentified case, I'll call it, that was maybe the catalyst for this meeting, and Wasserman FastLife investigation, I think you said there were other cases that were also involved and discussed that —

A. Yeah, probably, I mean, that's what agents do. That's what we did. We talked about other cases.

Q. Do you know how many other cases were --

A. Not that I recall, no..

Q. So what was your purpose in bringing up the Wasserman FastLife matter at this round table meeting?

A. Because I had large tax liens, large civil judgments, I had investors, I had a lot of money going to personal -- it looked like personal expenses, him, personally, other people in the Sarasota area.

Q. So based on that, did you believe this is a matter the FBI might be interested in?

A. A matter of FBI, a matter with the IRS with the tax liens.

Q. So were you trying, when you brought this up at the round table meeting to get the FBI involved in the investigation?

A. Yes, and the IRS, anybody in the federal system, yes.

Q. Was there somebody from the IRS at the meeting?

A. Yeah, I told you that.

Q. Who was that?

A. Shawn.

Q. He was from the IRS?

A. Yes.

Page 73

Q. So after this meeting -- strike that.

Case 8:20-cr-00207-CEH-NHA    Document 1227    Filed 06/15/26    Page 12 of 16 PageID
Case 6:25-cv-02498-AGM-RMN    Document 106    Filed 03/20/26    Page 42 of 44 PageID
214

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

Q. During the meeting, did Agents Volp or Stone say that they had some interest in pursuing or getting involved in the Wasserman FastLife investigation?

A. They initially did, because I believe if I'm not mistaken, Jay Stone went on an interview with me and Shawn at some point, either, I think it was in 2019, if I'm not mistaken at some point.

Q. What about at the meeting?

A. Well, I don't remember what the outcome of that was. They didn't -- they started, you know, doing other stuff.

Q. So is it fair to say they didn't say during the round table meeting, five minutes were devoted approximately to the Wasserman FastLife; no statements from Agent Stone or Volp that they were specifically interested in becoming involved in that investigation; is that fair?

A. I don't recall. I mean, Shawn worked out of the FBI office at that time.

Q. You don't recall Agents Volp or Stone saying anything to indicate that they were interested?

A. They might have, I don't recall.

Q. What about Agent Batsch, did he say anything at the meeting when you were all gathered?

A. I don't recall. I don't recall specifics of the meeting other than we talked about other cases as like a task force meeting.

Q. Did the FBI at any time following the meeting join in the investigation of FastLife and Mr. Wasserman?

A. I believe Jay Stone attended an interview with Shawn and I at some point in the investigation.

Q. Do you recall who that interview was of?

A. I think it was Mary Mertz (ph).

Q. And do you know why he attended? Strike that.
Did you invite him to the interview?

A. I don't recall -- I don't think I would have invited him, Shawn might have, but I'm not sure, but he was there with us.

Q. Mr. Batsch at that interview?

A. Yes, yeah, that's Shawn.

Q. Any other interviews that you conducted or participated in in which any FBI agent attended?

A. No, I think that was the only one.

Q. And do you know of your own personal knowledge, any other action that the FBI took that would have been part of the investigation of FastLife and Mr. Wasserman?

MR. WEISBERG: Object to form.

MR. SCHULTZ: Yeah, I'm going to going to object. We're getting into the law enforcement privilege, so I'm going to direct my client not to answer that question..

Q. Following this round table meeting, did you

Case 8:20-cr-00207-CEH-NHA   Document 1227   Filed 06/15/26   Page 13 of 16 PageID
Case 6:25-cv-02498-AGM-RMN   Document 10-2   Filed 03/20/26   Page 43 of 44 PageID
215

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

contact Mr. Batsch to see if he had interest in joining in the Wasserman FastLife investigation?

A. I mean, we were in regular contact on this other case, so we could have talked about it. And when he said, yeah, I'll write up something and get it opened at the State Attorneys office.

Q. So did you have further conversations with Mr. Batsch after the round table meeting to try to induce him to become involved in the Wasserman FastLife investigation?

A. I wouldn't say induced. I was pitching him and see if he would join in because of the avenue of the tax liens and civil judgments and investments and stuff like that.

Q. You wanted him to join — you wanted to get the Federal Government involved?

A. Not me personally, it was more of what I

I don't recall if other people will remember, but that's mostly what would have happened.

Q. You had been working with Mr. Batsch on your other case, the unidentified case for several months prior to the round table?

A. And the FBI agents, yes.

Q. And during that time you didn't mention the Wasserman FastLife situation to Mr. Batsch?

A. No, I don't think so. Not until later on, I think, if I remember directly toward the end of 2018 probably.

Q. I'm trying to clarify, was the round table meeting the first time you had mentioned the Wasserman FastLife investigation to Mr. Batsch?

A. Yeah, most likely, it would have been around the end of 2018 that I had spoken with Mr. Batsch and FBI to see what their -- gauge their interest on it.

Q. So after the round table meeting and I think you said you may have talked about the Wasserman FastLife situation for maybe five minutes?

A. Yeah.

Q. So after the meeting did Mr. Batsch or same day or next few days come up to you and say, hey, this Wasserman FastLife thing sounds interesting,
Page 162

tell me more?

A. Yeah, probably. Well, I'm saying, like, I don't know the specific details on how the case got from me to Shawn and to the fact that you're saying that, you know, in a couple days. I don't know the time frame of it, I just know that I had a case, I told Shawn about it and the FBI agents and then Shawn was interested in it, essentially, and so they moved forward in early 2019.

Q. Well, that's what I'm trying to find out, because as a result of what you said at the meeting, did he -- let me finish the question, please. Did he initiate contact with you, hey, tell me more about

Case 8:20-cr-00207-CEH-NHA    Document 1227    Filed 06/15/26    Page 14 of 16 PageID.
Case 6:25-cv-02498-AGM-RMN    Document 810-2    Filed 03/20/26    Page 44 of 44 PageID
216

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

this or did you initiate contact with him, hey, you know I want to tell you more about this, maybe this is something?

A. I have no idea.

Q. Who picked up the ball after the round table meeting?

A. I have no idea what happened after that, like how it went, either he contacted or I contacted him, I don't recall exactly how that went.

Q. And in your conversations within a relatively short time frame after the round table meeting, did you provide information to Mr. Batsch

Exhibit 3

-4-

promissory notes and some of whom obtained equity stakes. (*Id.* at 10 ¶¶34, 36-37.) But Wasserman also acknowledged that he had "financial problems" that resulted in tax liens being filed against him. (*Id.* at 8 ¶27.) As OFR Investigator Stephen Howland subsequently learned, many of the investors were senior citizens with no prior relationship with Wasserman or Rossman. (Doc. 77-2 at 2-3 ¶¶11, 15.)

Investigator Howland discussed the investigation with Shawn Batsch, a special agent with IRS-CI. (Doc. 81-3 at 25-26; Doc. 81-4 at 2 ¶1.) IRS-CI joined the investigation in 2019, with Agent Batsch taking the lead. (Doc. 81-2 at 170; Doc. 81-4 at 3 ¶4; Doc. 77 at 4 ¶22.) He did so in his capacity as an IRS-CI special agent and a member of the FBI's Joint Financial Crimes Task Force. (Doc. 117-1 at 3 ¶3.) The investigation focused on whether Wasserman defrauded investors in FastLife and committed various tax crimes. (Doc. 81-4 at 3 ¶4.) Those potential crimes included tax evasion, filing false tax returns, securities fraud, mail fraud, wire fraud, and money laundering. (Doc. 117-1 at 3 ¶4.) The non-tax and tax violations were part of a single investigation. (Doc. 117-1 at 3 ¶4; Doc. 77-2 at 5 ¶¶28-29.) In white collar fraud cases,